**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JITENDRA VEKARIA, | Index No. 1:22-cv-03197 |
| Plaintiff, | |
| v. | |
| MTHREE CORPORATE CONSULTING, LTD., JOHN WILEY & SONS, INC., ECI PARTNERS LLC, ALEX HEADLEY, BENJAMIN TOWN, THOMAS SEYMOUR, AND RICHARD CHAPMAN, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT WILEY AND MTHREE'S MOTION TO DISMISS**

**Capell Barnett Matalon & Schoenfeld LLP**
Attorneys for Plaintiff
1385 Broadway, Suite 1200
New York, New York 10018
(212) 661-1144
TTatko@cbmslaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………...…………..ii

INTRODUCTION……………………..……………………………….…..…..……1

STATEMENT OF FACTS……………………………………………….………4

      Defendant Wiley Putative Acquires Defendant MThree………......................…5

      Defendants' Improper Denial of Mr. Vekaria's MThree Stock…………………7

ARGUMENT…………………………………………………………………..8

    A. Defendants' Motion is Procedurally Flawed by Raising Fact Issues Not Proper on a
       Motion to Dismiss, Including Making Counter-Factual Allegations Without Personal
       Knowledge, and Both Quoting and Relying on Documents Not Within the Record,
       Which Quotations and Reliance Prejudice Plaintiff's Opposition and Per Se Create
       Issues of Fact Requiring Discovery…………………………………………9

    B. Plaintiff's Labor Law Claims Should Not Be Dismissed Because Plaintiff's Stock-
       Equity was a Non-Discretionary
       Wage…………………………………………………………………..11

    C. Plaintiff's 10(b) and 10(b)-5 Claim Is Timely, and a Quid Pro Quo of Labor for Stock
       Is Actionable Under the Exchange
       Act……………………………………………………………13

    D. Plaintiff Has Pled Tortious Inference as Against Wiley vis-à-vis its Procurement of
       MThree's Breach of the Employment
       Agreement…………………………………………………………18

    E. Plaintiff's Conversion Claim Is Valid Against Both Defendants and Not Duplicative
       Since Wiley Is Not Subject to Plaintiff's Breach of Contract Claim and Conversion
       Encapsulates MThree's Pre-Contract Formation Acts………………………..21

CONCLUSION……………………………………………………………22

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,

556 US 662 (2009)……..……………………………………………………8

*Bell Atl. Corp. v. Twombly*,

550 US 544  (2007)……………….……………………………………………8

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,

493 F.3d 87 (2d Cir. 2007)….……………………………………………8

*Chambers v. Time Warner, Inc.*,

282 F.3d 147 (2d Cir. 2002)..………………………………………...8, 10

*Faulner v. Beer*,

463 F.3d 130 (2d Cir. 2006)…………….……………….......................8

*Yoder v. Orthomolecular Nutrition Institute, Inc.*,

751 .2d 555 (2d Cir. 1985)…….....................................................16

*Ryan v. Kellog Partners Institutional Services*,

19 NY3d 1 (2012)  …………………………………………………………3

*Alishaev Brothers inc. v. LA Girl Jewelry Inc.*,

2020 WL1489841 (SDNY 2020)……………………………………..21

*Argo Contracting Corp. v. Paint City Contractors, Inc.*,

2000 WL 1528215 (SDNY 2000)…………………………………......8

*Astroworks, Inc. v. Astroexhibit, Inc.*,

257 F.Supp.2d 609 (SDNY 2003)…………………………………….21

*Barnet v. Drawbridge Special Opportunities Fund LP*,

2014 WL4393320 (SDNY 2014)…………… …………………………...20

*Brown v. Showtime Networks, Inc.*,

394 F.Supp.3d 418, 446 (SDNY 2019)………………………………14

*DeLeonardis v. Credit Agricole Indosuez*,

  2000 WL 1718543 (SDNY 2000)…………………………………………..13

*Dubin v. E.F. Hutton Group Inc.*,

  695 F.Supp. 138 (SDNY 1988)…………………………………………..16

*Granite Partners, L.P. v. Bear, Stearns & Co.*,

  58 F.Supp.2d 228 (SDNY 1999)………………………………….…….8

*Hallet v. Stuart Dean Co.*,

  481 F.Supp.3d 294 (SDNY 2020)…………………………………....3, 11, 12

*Lankau v. Luxoft Holding, Inc.*,

  266 F.Supp.3d 666 (SDNY 2017)……………………………….....16, 17, 19

*Lickteig v. Cerberus Management, L.P.*,

  2020 WL1989424 (SDNY 2020)……………………………………...13, 14

*Moon Joo Yu v. Premiere Power LLC*,

  2018 WL456244 (SDNY 2018)……………………………………………13, 14

*N. Shipping Funds I, LLC v. Icon Capital Corp.*,

  2013 WL1500333 (SDNY 2013)……………………………………...19, 20

*Niederhogger, Cross & Zeckhauser, Inc. v. Telstat Sys., Inc.*,

  436 F.Supp. 180 (SDNY 1977)……………………………………………17

*Ramiro Aviles v. S & P Global, Inc.*,

  380 F.Supp.3d 221 (SDNY 2019)…………………………………………14

*Wallace v. BMO Nesbitt Burns Corp.*,

  2002 WL 32063120 (SDNY 2002)…………………………………….13

*Matter of Lerner v. Credit Suisse Sec. (USA) LLC*,

  193 AD3d 649, 650 (1st Dept 2021)  …………………………………2, 11, 12

*Truelove v. Northeast Capital & Advisory Inc.*,

  268 AD2d 648, 649-50 (3d Dept 2000), *aff'd*, 95 NY2d 222 (2000).. 2, 11, 12, 13

**Statues**

17 CFR § 240.10b……………………………………………………………8, 13, 16, 17

17 CFR § 240.10b-5… …………………………………………………….. *passim*

**INTRODUCTION**

Plaintiff Jitendra Vekaria is a former employee of MThree.  He was approached and recruited by MThree to leave his gainful employment with J.P. Morgan and to give up substantial equity-based compensation that he would have received by staying with J.P. Morgan in order to join MThree, on the agreement and inducement that Mr. Vekaria would: (1) become an immediate stockholder in MThree, receiving up-front equity in the amount of a 1% percentage interest in MThree, and (2) receive an additional 2% percentage interest in MThree that would vest in 1% increments on the first and second anniversaries of his hire date; provided that if MThree were to be acquired before the additional equity vested, the remaining amount would vest automatically for a total percentage interest of 3%.  Less than a year after Mr. Vekaria's hiring, MThree was putatively acquired by Wiley (MThree and Wiley, collectively, "Defendants"), through the sale of all of MThree's outstanding stock to Wiley, but neither Wiley nor MThree paid Mr. Vekaria a dime for his MThree stock.  Now they both disclaim that Mr. Vekaria owned (and still owns) his stock in MThree or that they had an obligation to pay him for his stock, and seek to dismiss several of the claims asserted against them in Mr. Vekaria's complaint – specifically, Mr. Vekaria's Third and Fourth claims ("Labor Law" claims), Seventh claim ("10(b) and 10(b)-5" claim), Eighth claim (interference with a contract), and Ninth claim (conversion).

Wiley and MThree's motion to dismiss should be denied on multiple grounds.

A.    Defendants have taken procedurally invalid positions that are fatal to their motion on its face.

- Defendants base their motion in substantial part on refuting the truth of Plaintiff's allegations and asserting counter-factual allegations, which is not proper on a motion to dismiss.  Indeed, there is no affidavit from any person with personal knowledge of these facts, and Defendants' counsel's attestations in his memorandum of law, with no supporting documentation or basis of knowledge

1

offered as to why counsel (who was not involved at all in the hiring of Mr. Vekaria) would know what he claims to know, are without merit and cannot refute the Complaint.  In fact, several of these allegations create ostensible issues of fact even if they should be credited by the Court, namely, the allegations (made by Defendants' counsel personally) that there are additional persons that were parties to the contract at issue (not raised by way of FRCP Rule 12(b)(7)), and that Plaintiff never demanded payment for his equity or award of his shares (which is not the case).

- Defendants improperly defend against the Complaint by citing and quoting several apparently critical and contradictory documents to those relied on by Plaintiff, but yet fail to attach them to their moving papers.  This is telling.  Defendants likely realized that, while their cited and quoted "documentary evidence" may help them form an argument in support of early dismissal of Plaintiff's claims, the risk was too great that putting in these documents would create issues of fact that would require the denial of Defendants' motion.  Defendants seemed content, however, with merely relying on their counsel's affirmations as to what these alleged documents say.  This strategy is clearly prejudicial to Plaintiff who cannot effectively rebut these documents without their production.  Nonetheless, Defendants cannot avoid the inevitable conclusion that their citations and reliance on these documents in support of their motion entail – that the ostensibly contradictory agreements at issue, cited to, quoted by, and relied on by Defendants in their motion, create issues of fact that require denial of the motion pending discovery of the agreements.

- Indeed, beyond the contradictory documents that allegedly exist, the other documents relied on and actually quoted by Defendants in their supporting arguments (but not attached to their papers), were neither relied on, referenced, or incorporated into Plaintiff's Complaint, and thus even if submitted by Defendants would nonetheless be improper extrinsic evidence.

For these procedural failures alone, Defendants' motion should be denied.  But the motion to dismiss should also be denied on substantive grounds.

B.      Defendants argue that the Labor Law claims are subject to dismissal at this early juncture, claiming that somehow: (1) equity-based compensation is not a wage, and (2) discretionary sign-on bonuses are not wages.  Defendants are wrong.  For the first proposition, Defendants rely on *Matter of Lerner v. Credit Suisse Sec. (USA) LLC*, 193 AD3d 649, 650 (1st Dept 2021), which relied on the analysis of the New York Court of Appeals' decision in *Truelove v. Northeast Capital & Advisory Inc.*, 268 AD2d 648, 649-50 (3d Dept 2000), *aff'd*, 95 NY2d 220 (2000).  However, the New York Court of Appeals expanded the test for equity-as-

2

wages recovery in *Ryan v. Kellog Partners Institutional Services*, 19 NY3d 1 (2012), which the Southern District has acknowledged as controlling in *Hallet v. Stuart Dean Co.,* 481 F.Supp.3d 294 (SDNY 2020).  As to the second proposition, Plaintiff never alleged his equity was a sign-on bonus, and the additional investiture-schedule evidences that this was not the case, nor was such equity in any manner discretionary – in fact, there is nothing discretionary about Mr. Vekaria's equity at all.

        C.     Plaintiff has a valid securities-based 10(b) and 10(b)-5 claim.   Because the limitations-period for 10(b) and 10(b)-5 claims only commence at the end of the reasonable discovery period for the misrepresentation, Plaintiff filed within the limitations period on the face of the Complaint.  Second, caselaw holds that a *quid pro quo* of stocks for employment is a covered transaction under 10(b) and 10(b)-5.

        D.     Likewise, Mr. Vekaria has properly pleaded that Wiley improperly interfered with his contract with his former employer, MThree.  Defendant Wiley benefitted from such interference, and the mere fact that Wiley may have received representations and warranties from certain parties in connection with its putative acquisition of MThree is of no moment, nor does it exculpate Wiley from its improper conduct.

        E.     Finally, Mr. Vekaria has a viable conversion claim against both Wiley and MThree.  As to Wiley, Defendants are incorrect when they argue that the conversion claim is somehow duplicative of Plaintiff's breach of contract claim – the reality is that Plaintiff did not plead breach of contract against Defendant Wiley, and thus the conversion claim is not duplicative.  Further, the conversion claim is not duplicative against MThree because the conversion claim encompasses pre-contract formation acts, thus enlarging the scope of damages and discovery beyond breach of contract.

For these and the foregoing reasons, Mr. Vekaria asks this Court to deny Defendants' motion to dismiss and allow these claims, as well as those claims that are not subject to this motion, to proceed to discovery.

## STATEMENT OF FACTS

Plaintiff began employment at MThree on or about January 7, 2019, as a salesperson in MThree's sales department for North America. Complaint at ¶ 22 (Dkt. No. 1).[1]  Prior to the joining MThree, Plaintiff engaged in extensive pre-employment discussions and negotiations with each of Defendants Headley, Town, Seymour, and Chapman.  *Id.* at ¶ 27.  Each of Defendants Headley, Town, Seymour, and Chapman were employed by and/or agents of MThree at all relevant times leading up to, and subsequent to, Mr. Vekaria's hiring by MThree.  *Id.* at ¶ 26.  Each of Headley, Town, Seymour, and Chapman were actively involved in the hiring of Mr. Vekaria.  *Id.*

These pre-employment discussions stretched over several months.  During such time, Plaintiff was employed by J.P. Morgan.  *Id.*  At numerous times during these pre-employment discussions, Plaintiff informed MThree and each of Defendants Headley, Town, Seymour, and Chapman that if he left his then-current employment with J.P. Morgan, Plaintiff would lose a very substantial amount of equity-based compensation from J.P. Morgan, and that Plaintiff would not leave his employment with J.P. Morgan and join MThree unless he received a meaningful equity position in MThree.  *Id.* at ¶ 28.  On January 2, 2019, Mr. Headley, the Chief Executive Officer of MThree, sent an email to Mr. Vekaria, which was copied to Mr. Seymour.  *Id.* at ¶ 29.  In such email, Mr. Headley confirmed and represented that Plaintiff would receive an immediate, fully vested stock issuance comprising 1% of the fully diluted capital stock of

---

[1] The following select factual allegations are taken from Plaintiff's Complaint, and capitalized terms are used with the same meaning as defined in that document.

MThree (the "Initial Stock") and additional stock comprising an additional 2% of the fully diluted capital stock of MThree, which was to be issued to Plaintiff immediately upon an acquisition of MThree, or otherwise in 1% increments upon the first and second anniversaries of Mr. Vekaria's hire date (the "Additional Stock"; the Initial Stock and the Additional Stock, the "MThree Stock"). *Id.* at ¶ 25. Mr. Headley directed Mr. Seymour to prepare the Employment Agreement to reflect such representations and understandings. *Id.* Mr. Seymour also communicated directly with Plaintiff regarding the terms of the Employment Agreement, including specifically as to the equity that Plaintiff needed to receive in order to join MThree. *Id.*

On or about January 7, 2019, Plaintiff and MThree entered into the Employment Agreement. *Id.* at ¶ 23. The Employment Agreement was signed by Plaintiff and by Defendant Seymour on behalf of MThree.[2] *Id.* Pursuant to the Employment Agreement, MThree agreed to provide Plaintiff with the Initial Stock, effectively immediately upon the execution of the Employment Agreement. *Id.* at ¶ 24. In addition, pursuant to the Employment Agreement, MThree agreed to provide Plaintiff with the Additional Stock, comprising an additional 2% of the fully diluted capital stock of MThree, which was to be issued to Plaintiff immediately upon an acquisition of MThree, or otherwise in 1% increments upon the first and second anniversaries of Mr. Vekaria's employment – January 7, 2020, and January 7, 2021, respectively. *Id.* at ¶ 25.

Defendant Wiley Putatively Acquires Defendant MThree

On January 1, 2020, MThree was putatively acquired by Wiley. *Id.* at ¶ 31. Upon information and belief, immediately prior to the Putative Wiley Acquisition, ECI was the

---

[2] None of the individual Defendants or corporate Defendant ECI have joined in this Motion.

majority shareholder of MThree, and each of Defendants Headley, Town, Seymour, and Chapman held stock, or comparable equity rights or interest, in MThree.  *Id.* at ¶ 32.

Wiley is a publicly traded company listed on the New York Stock Exchange.  *Id.* at ¶ 33. In or about January of 2020, Wiley ostensibly acquired 100% of the MThree stock in a $129 million transaction.  *Id.* at ¶¶ 34-35.  Plaintiff's equity would therefore be valued at $3,858,000.00, or 3%.  *Id.* at ¶ 36.  At no time did Plaintiff agree to sell or transfer his equity in MThree to Wiley in conjunction with the Putative Wiley Acquisition, nor did Plaintiff sign any documents to any such effect.  *Id.* at ¶ 40.

In conjunction with the Putative Wiley Acquisition, Mr. Vekaria received a transaction bonus, which MThree awarded to him and many other employees of MThree, regardless of whether or not they held stock ownership in MThree.  *Id.* at ¶ 39.  In connection with such transaction bonus, Mr. Vekaria received a letter from MThree, stating that the transaction bonus was made "in recognition of [Mr. Vekaria's] support to [MThree] to date" and for Mr. Vekaria's "support and efforts in helping to make this transaction a success." *Id.* This letter said nothing at all about Mr. Vekaria's stock in MThree, nor made any mention at all that the transaction bonus was somehow related to or in consideration for Mr. Vekaria's MThree Stock.  *Id.*  Indeed, the transaction bonus was given to Mr. Vekaria and other MThree employees for the very reasons stated in the letter – for their "support and efforts in helping to make this transaction a success" – and had nothing to do with stock.  *Id.*

Following the closing of the Putative Wiley Acquisition, Plaintiff remained an employee of MThree for four more months, until April 2020.  *Id.* at ¶ 41.  At the time of his separation of employment, Plaintiff had spent approximately one year and three months of continuous employment at MThree.

<u>Defendants' Improper Denial of Mr. Vekaria's MThree Stock</u>

Subsequent to his separation of employment with MThree, Plaintiff sought to clarify the status of his MThree Stock with MThree and Wiley as well as certain tax issues resulting from the transaction. *Id.* at ¶ 42. These discussions were escalated to senior members of MThree's and Wiley's management team, and included Mr. Town and Mr. Seymour, who remained employed with MThree subsequent to the Putative Wiley Acquisition. *Id.*

Over the course of these discussions, Wiley and MThree took the position that Plaintiff was somehow not a stockholder, and that Plaintiff was not entitled to any compensation on account of his MThree Stock. *Id.* at ¶ 43. In fact, Steven Sklar, Vice President of Global Tax at Wiley, wrote in email correspondence where Mr. Town was copied that Mr. Vekaria's claims were based in "fraud or fraudulent inducement" and that Plaintiff should "look to sellers of MThree to address these claims." *Id.* This email correspondence effectively serves as an admission that Plaintiff was misled by the "sellers," which include Mr. Town. *Id.* In turn, ECI – the apparent majority stockholder of MThree prior to the putative acquisition – has rejected any claims of liability whatsoever on account of Mr. Vekaria's MThree Stock. *Id.*

To date, Plaintiff has not received a single stock certificate or any compensation whatsoever on account of his MThree Stock. *Id.* at ¶ 45.

Plaintiff has held constructive ownership of the MThree Stock since he properly executed the Employment Agreement. Defendants' improper refusal to acknowledge and/or issue the shares does not invalidate his ownership. *Id.* at ¶ 46. Nor does the Putative Wiley Acquisition, as Plaintiff has never transferred any of his stock in MThree at any time. *Id.* Indeed, MThree's and Wiley's naked assertions that Wiley has somehow acquired "100%" of MThree's stock have been, and continue to be, misleading and untrue. *Id.*

7

## <u>ARGUMENT</u>

A complaint must only allege enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 US 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 US 662, 678 (2009).  A court must accept all factual allegations contained therein and draw all reasonable inferences in the non-movant's favor.  *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

However, when a court is presented with documents extrinsic to the pleadings on a motion to dismiss, the court must give the parties an opportunity to conduct appropriate discovery.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002); *See also Faulner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document" (citations omitted); *Argo Contracting Corp. v. Paint City Contractors, Inc.*, 2000 WL 1528215 at *2 (SDNY 2000) ("[w]hen a plaintiff alleges a written agreement, but does not possess that agreement, courts generally allow discovery to take place."); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F.Supp.2d 228, 251–52 (SDNY 1999) (denying motion to dismiss to allow discovery of "a signed, enforceable copy of the ... letter may ... be found within the defendants' possession").

A. <u>Defendants' Motion is Procedurally Flawed by Raising Fact Issues Not Proper on a Motion to Dismiss, Including Making Counter-Factual Allegations Without Personal Knowledge, and Both Quoting and Relying on Documents Not Within the Record, Which Quotations and Reliance Prejudice Plaintiff's Opposition and Per Se Create Issues of Fact Requiring Discovery</u>

In substantial part, Defendants' motion is fundamentally flawed by asking this Court to make factual determinations at this early stage, which is not proper on a motion to dismiss. Defendants' counsel raises counter-factual allegations in Defendants' Memorandum of Law in Support which are not based on personal knowledge or Plaintiff's Complaint.  Defendants' counsel also relies on, cites to, and quotes extensively from documents (allegedly contradicting the Complaint) not attached to Defendants' motion.  As to counsel's attestations, they should be disregarded, but if credited create issues of fact; as to the documents quoted from and referenced, these must be disclosed in discovery and the motion should be denied pending the same.

Defendants' counsel makes the following attestations in his papers, in direct quotation:

- Mr. Vekaria had not previously demanded or otherwise received grant awards or share certificates from MThree during the term of his employment, either before or after the acquisition by Wiley. (Memorandum of Law in Support at 1.)

- Neither Wiley nor MThree has been able to locate a draft or execution version of the Offer Letter dated January 7, 2019 that contains these specific terms.  The Offer Letter dated January 7, 2019 that MThree and Wiley have in their files contemplates that an additional award of equity will be issued to Mr. Vekaria at MThree's discretion.  Mr. Vekaria declined Wiley and MThree's request to provide a copy of the executed Offer Letter containing the specific terms reflected in the Complaint. For purposes of this Partial Motion to Dismiss, MThree and Wiley will assume Mr. Vekaria will eventually be able to produce an executed version of the Offer Letter with the terms he claims are contained therein. (*Id.* at 2, fn. 1.)

- On December 31, 2019, John Wiley & Sons, Limited (a wholly-owned subsidiary of Defendant Wiley) entered into an agreement (<u>the "Acquisition Agreement"</u>) to acquire 100% of the shares of MThree from Defendants ECI Partners, Alex Headley, Benjamin Town, <u>and nonparty Andrew Vaughan</u> (excepting Mr. Vaughan, the "Defendant MThree Sellers").  *Id.* ¶ 3.  The MThree Sellers warranted in the Acquisition Agreement that they were the sole beneficial owners of the shares and that they sold them free of any security interests or the need for consent of any third parties. Moreover, Defendants Headley and Town each warranted that MThree <u>"did not have and is not proposing to introduce any share incentive scheme, share option scheme or profit-sharing bonus for any director, officer, Employee or Consultant."</u> (*Id.* at 3) (emphasis added).

- Mr. Vekaria alleged in his Complaint that Defendants Thomas Seymour and Richard Chapman were also sellers; this is untrue. (*Id.* at 3, fn. 2.)

As is made evident by the above bullet-point list, Defendants' counsel has gone beyond all known procedures regarding factual attestations and documentary evidence in motions to dismiss in citing and relying on documents that apparently contradict Plaintiff's allegations, and further, purportedly provide Wiley a defense to liability vis-à-vis an alleged "Acquisition Agreement" wherein MThree misrepresented the equity status of its employees to Wiley.  This practice is not permissible in motions to dismiss, which prohibit the inclusion of extrinsic evidence unless relied on or integral to Plaintiff's Complaint.  *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153-154 (2d Cir. 2002).

While it may have been arguable that the Employment Agreement which initially granted Plaintiff's equity in MThree could have qualified as "intrinsic" to Plaintiff's Complaint, Defendants' counsel alleges that Defendants have in their possession a different agreement that contradicts Plaintiff's agreement.  However, it is not attached to their papers.  Assumedly this is because Defendants do not wish to create an issue of fact that would require the denial of their motion, but one cannot un-ring the bell once rung.

Additionally, Defendants not only mention, but actually quote from a purported "Acquisition Agreement" (underlined, above) that purports to have disclaimed all equity agreements between MThree and its employees during the Wiley-MThree sale.  This document would create an issue of fact regarding a claim or defense at issue, and thus discovery is warranted. Defendants failure to attach the same to their motion was likely done to avoid just this scenario.  Notably, Mr. Vekaria is not in possession of such "Acquisition Agreement," nor does it appear to be publicly available.

It is also important to note that Defendants' counsel takes the unusual tact of directly counter-alleging that Defendants Seymour and Chapman were not sellers of MThree stock, and that the acquisition included an additional person as seller, Andrew Vaughan, who has not been

10

named a party to this lawsuit.  *Supra.*  Such allegations are (1) entirely unfounded and

incompetent evidence to rebut the Complaint, and (2) raise serious issues of fact, such as the

possibility that Plaintiff must also now name Mr. Vaughan as a party because of a purported

agreement that was neither mentioned in Plaintiff's Complaint nor produced on Defendants'

motion.

       The serious breaches of procedure in Defendants' motion severely prejudice Plaintiff's

opposition, as Plaintiff does rely on or integrate either (1) the allegedly contradictory agreement

cited by Defendants or (2) the purported "Acquisition Agreement" actually quoted in

Defendants' papers.  Defendants' counsel's attestations should be disregarded, but if credited

create procedural issues that must be dealt with outside of a motion to dismiss, including the

possibility of an additional seller of the MThree stock (Andrew Vaughan) and allegations that

Defendants Seymour and Chapman were not in fact sellers.  The motion should be denied on

these grounds alone.

    B.  <u>Plaintiff's Labor Law Claims Should Not Be Dismissed Because Plaintiff's Stock-Equity</u>
        <u>Was a Non-Discretionary Wage</u>

       Defendants argue that Plaintiff's unpaid equity ownership in MThree was not a wage

subject to the Labor Law because "its ultimate value is dependent on the future market value of

the company stock," relying on *Matter of Lerner v. Credit Suisse Sec. (USA) LLC,* 193 AD3d

649, 650 (1st Dept 2021).  However, *Matter of Lerner* primarily relies on, and is analogous to,

*Truelove v. Northeast Capital & Advisory Inc.*, 268 AD2d 648, 649-50 (3d Dept 2000), *aff'd* 95

NY2d 220 (2000), which is an older New York Court of Appeals case that has since been

expanded in *Ryan v. Kellog Partners Institutional Services*, 19 NY3d 1 (2012) to encompass

actions such as that at bar. This expansion of equity-as-wages has been recognized in the

Southern District by *Hallet v. Stuart Dean Co.,* 481 F.Supp.3d 294 (SDNY 2020).

In *Hallet*, the Southern District held that *Truelove* (relied on by Defendants) was expanded by the Court of Appeals of New York to encompass actions by employees regarding their equity when (1) the employee was promised a non-discretionary bonus to entice him to switch jobs, which was not paid; (2) the bonus was linked to his labor or services; and (3) had been earned and vested. *See Hallet*, 481 F.Supp.3d at 309-310 (discussing and distinguishing *Truelove*).  Primarily, the *Hallet* Court found that a key distinction between the newer *Ryan* and the older *Truelove* was that some former employees had been making equity-as-wages claims for equity that "depended solely upon his employer's overall financial success" and were "entirely discretionary." *Id.* at 309.

In support of its motion, Defendants argue that (1) on analogy to *Matter of Lerner*, Defendant cannot make out a claim and (2) the equity was discretionary.  As above, *Matter of Lerner* concerned facts that are not analogous and have since been expanded upon. Primarily, the distinction can be seen in the type of equity at issue in *Matter of Lerner*, which was (a) a type of "deferred equity compensation" and (2) "was dependent on the future market value of the company."  *Matter of Lerner*, 193 AD3d at 32.  That court also exclusively relied on *Truelove* for this proposition, which is notable because in *Truelove*, the equity-compensation at issue was a "bonus/profit sharing pool," wherein all the employees were entitled to withdraw, at the discretion of their employer, a set amount of money per annum depending on the company's success. *Truelove v. Northeast Capital & Advisory*, 95 NY2d at 222-223.  The *Truelove* court held that such fluctuations of the market and the discretionary nature of the "equity" weighed against considering that interest as a "wage" under the labor law.  *Id.*

Neither the *Matter of Lerner* case nor that of *Truelove* are analogous to that at bar where Plaintiff alleges that he is entitled to 3% of the entire company of MThree, which vested at two different points, one being his commencement and the second being the sale of MThree.  The

amount of this equity did not fluctuate with the market, as it was not a money-pooling or profit-sharing scheme, and unlike in *Truelove*, was not discretionary.

Defendants also argue that purely discretionary bonuses (sign-on or otherwise) in the form of equity are not wages, citing *DeLeonardis v. Credit Agricole Indosuez*, 2000 WL 1718543, (SDNY 2000) (unreported); *Truelove,* 268 AD2d at 649-50; *Wallace v. BMO Nesbitt Burns Corp.*, 2002 WL 32063120 at *6 (SDNY 2002) (unreported).  As above, Plaintiff never alleged that his equity was discretionary, but rather quite the opposite.  To the extent that Defendants are relying on their purported "contradictory agreement" that allegedly states that the equity was to be given at the discretion of MThree (*see* Memorandum of Law in Support at 2, fn. 1), which has not been attached to their motion papers, such reliance is prejudicial and not properly authenticated.  To that extent, the motion should be denied as it is entirely supported by incompetent evidence.

C.  Plaintiff's 10(b) and 10(b)-5 Claim Is Timely, and a Quid Pro Quo of Labor for Stock Is Actionable Under the Exchange Act

Plaintiff timely filed the instant action after conducting a reasonable investigation into what happened to his stock after he left MThree, and after investigating why he was not issued new stock or cashed out at the time of his resignation in April 2020.  Complaint at ¶¶ 42-44.  Under prevailing law, the statute of limitation does not begin to commence until the end of a reasonable investigation into fraudulent activity.  *See e.g., Lickteig v. Cerberus Management, L.P.,* 2020 WL1989424 (SDNY 2020) (unreported); *Moon Joo Yu v. Premiere Power LLC*, 2018 WL456244 (SDNY 2018) (unreported).  On a motion to dismiss, dismissal due to a statute of limitations is "often inappropriate" and should only be done in "extreme circumstances" when the "the facts on the face of the complaint . . . are sufficient to establish a 'duty of inquiry' as a matter of law."  *See Ramiro Aviles v. S & P Global, Inc.,* 380 F.Supp.3d 221, 277 (SDNY 2019) (citations omitted).

In this case, Defendants have not met their burden which required them to prove, on the face of the Complaint and as a matter of law, when Plaintiff should have begun and/or concluded his investigation into Defendants' acts such that he could plead all elements of his claim.  It is respectfully submitted here that they have not done so.

In *Lickteig*, *supra*, the Southern District found that where a defendant sold its business to a competitor, the sale itself did not give rise to an inference of wrong-doing on behalf of the defendants because "on its face" the sale did not "indicate . . . misconduct."  *Lichteig,* WL1989424 at *7.  "Hence, this information would not have 'prompted a reasonably diligent plaintiff to begin investigating.'"  *Id.* (citation omitted).

In a similar case, the plaintiff-investor did not receive payment at the promised date, but nonetheless the Southern District did not hold that this date was the beginning of the limitations-period for a 10(b)-5 claim.  *Moon Joo Yu*, WL456244 at *6-9.  The Southern District specifically held that where the defendant had failed to pay on an investment, the cause of action arose not when a reasonable investor could have begun investigating at the missed-payment date, but when such an investigation would reasonably show that the failure to pay was fraudulent, and scienter could be sufficiently alleged.  *Id.* at *5.

Indeed, to the extent that the furthest-most point of the two-year limitations period cannot be reasonably defined at an exact date from the pleadings, this must be resolved in discovery. *See Brown v. Showtime Networks, Inc.*, 394 F.Supp.3d 418, 446 (SDNY 2019) (when issue of fact as to inquiry notice is raised in a motion to dismiss, it must be "fleshed out in discovery" and then "raise[d] . . . again in a motion for summary judgment").

Here, it cannot be said that Plaintiff knew, definitively on the face of the Complaint, that he had been defrauded and his equity-status had been misrepresented to him as of the date of sale of his then-current employer MThree to Wiley.  In his Complaint, Plaintiff alleges that he was

still employed at MThree at the time of the purported sale in January of 2020. Complaint at ¶¶ 31, 41. He further alleges that he received a payment of money from MThree at or about the same time of this purported acquisition (though Plaintiff disputes that this payment was made in consideration for his 3% equity in MThree). *Id.* at ¶ 39. At that time, it is reasonable to opine that Plaintiff could have thought a number of things, including that his stock would be transferred to his new employer Wiley, that he would be retaining his stock in MThree (or receiving comparable stock in Wiley), or even that he would be paid out at a later date, including once he left his employment. None of this is patently unreasonable, nor did Plaintiff apparently have cause for concern at the transaction date as he remained employed for an additional four months. Indeed, his allegations regarding what occurred once he resigned from MThree show his state of mind at the time, and that he clearly did not know he was defrauded until after he discussed his equity with MThree and Wiley post-resignation.

Once Plaintiff resigned in April of 2020, he alleges that he reached out to MThree and Wiley because he had encountered tax issues resulting from the purported acquisition. Complaint at ¶ 42. These discussions went on for a period of time as they wound through senior management of Wiley and MThree. *Id.* at ¶ 43. It was during the course of these conversations that Wiley finally denied having any liability for Plaintiff's equity, and further, explicitly told him that Plaintiff's "claims were based in 'fraud or fraudulent inducement' and that Mr. Vekaria should 'look to sellers of MThree to address these claims.'" *Id.* Plaintiff alleges that he could satisfactorily plead a 10(b)-5 claim in 2021. *Id.* at ¶ 91. Plaintiff filed this action in April of 2022. Even if these conversations occurred in April of 2020 (month of resignation), though Plaintiff alleges these conversations occurred over a period of time into 2021, Plaintiff would still be within the limitations-period of two years. To the extent that a more granular end-date for these conversations is not on the face of the Complaint, Defendants have not met their burden

in proving the start date of the statute of limitations, and this can and should be resolved in discovery.

Defendants next argue, in relation to the 10(b) and 10(b)-5 claim, that Plaintiff has not stated a cause of action for a "misrepresentation . . . made with respect to the defendant's willingness to comply with an agreement to transfer a security" and that only a statement made about the "value" of the security is actionable.  Memorandum of Law in Support at 8-9. Defendants misread their cited authority.

When a plaintiff enters into a "quid pro quo offered to induce plaintiff into the employ of [defendant]," such an offering is a covered transaction under the Exchange Act. *Dubin v. E.F. Hutton Group Inc.,* 695 F.Supp. 138, 146-147 (SDNY 1988) (citation omitted) (also cited in Defendants' Memorandum of Law in Support at 8).  In that case, the Southern District specifically held that where a defendant misrepresented the vesting conditions of securities in connection with an offer of employment, which would affect whether or not a potential employee would accept an offer of employment, such a "transaction" was a "purchase" of a "security."  *Id.* at 147.  It is of note that the stock offering in *Dubin* was almost identical to that at bar, where the plaintiff's equity was misrepresented, and the company informed him that upon its acquisition his stock was forfeit.  *See discussion at Lankau v. Luxoft Holding, Inc.*, 266 F.Supp.3d 666, 678 (SDNY 2017).

Indeed, the *Dubin* Court held, citing *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 .2d 555 (2d Cir. 1985), that "a contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed . . . . We see no reason why . . . an individual who commits herself to employment by a corporation in return for stock or the promise of stock should not be considered an investor."  *Id.* at 144.  The *Dubin* Court specifically found that when an employee accepts employment in reliance on the promise

for the issuance of security, he or she is acting as an "investor" who depends on the representations made by the transferor of the security. *Id.* at 145.

Further, the *Dubin* Court specifically distinguished these facts from those relied on in Defendants' cited case *Niederhogger, Cross & Zeckhauser, Inc. v. Telstat Sys., Inc.,* 436 F.Supp. 180 (SDNY 1977), where the plaintiff had an agreement with the defendant to "find" a purchasing company to acquire the defendant, and thereafter would reimburse the plaintiff with the stock of whatever company he found to consummate the transaction. *Id.* at 144-145. This agreement was memorialized in a contract. *Id.* The *Niederhoffer* court held that because there was no particular security at issue, but rather just an agreement that the defendant never complied with, there was no 10(b)-5 claim. *Id.* These facts are clearly distinguishable from the instant ones because here there is a covered transaction of specific securities in MThree, misrepresentations about the vesting status of the securities, and refusal to pay for the same.

As to Defendants' second cited case, *Lankau*, *supra*, that case is not on-point because there the plaintiff did not allege that there had ever been a covered transaction, but rather that he had not received unvested stock options. *Lankau* at 679. This is not the case here where Plaintiff has alleged that the initial stock vested upon entering the Employment Agreement and that he constructively possessed the equity throughout his employment and even to this day. Complaint at ¶ 46. If this were not the case, Defendants' mere refusal to acknowledge his equity ownership would defeat his claim, which interpretation would not only be unsound, but unjust.

Therefore, pursuant to *Dubin*, Plaintiff has alleged a covered transaction that entails a *quid pro quo* of labor for securities, and thus Defendants are liable under 10(b) and 10(b)-5.

D. Plaintiff Has Pled Tortious Interference as Against Wiley vis-à-vis its Procurement of MThree's Breach of the Employment Agreement

Plaintiff alleges that Wiley knew or should have known of the Employment Agreement when Wiley purportedly acquired MThree, of which company Plaintiff owned a 3% vested

interest in pursuant to his Employment Agreement.  Complaint at ¶ 98.  In defense of this claim, Wiley argues, based on counsel's *ex post facto* speculation, that Wiley "would have paid the same price regardless of whether Mr. Vekaria had been granted the MThree Equity." Memorandum of Law in Support at 10.  This is speculation in its purest form, and indeed such an assertion may require expert testimony as to the hypothetical value of a major acquisition of 100% of the outstanding shares of a company, where there are (1) increased transaction costs associated with multiple equity-holders; (2) potential fluctuations in price for holdout sellers or other objectants; (3) difference in bargaining power and leverage held between the parties to such a transaction considering that MThree did not have full authority or consent to the sale of its entire stock, and (4) many other minute financial conditions that would likely have produced a different price.  Defendants' mere conjecture that the same price would have been paid regardless of Plaintiff's equity is unsupported.  Indeed, it is downright refuted by Plaintiff's allegations, when he specifically alleges that "[b]y refusing to recognize Mr. Vekaria's MThree Stock, the Defendants have accrued additional value with regard to their individual stock interest without legitimate basis to the detriment of Mr. Vekaria."  Complaint at ¶ 101.

Further, to the extent that Wiley is relying on the alleged representations of MThree contained in an as-of-yet unproduced document labeled "Acquisition Agreement" wherein MThree specifically claimed that there were no employee-equity holders, discussed *supra*, such reliance is prejudicial to Plaintiff as that document is not attached to Defendants' motion nor appropriate as a defense at this stage of litigation.  As such, Wiley must stand on its caselaw without regard for its speculations and improper evidentiary allegations, which caselaw does not comport with the facts of this case.

Wiley primarily relies on a causation argument tied to the fact that the initial investiture of Plaintiff's equity occurred at his hiring in January 2019, a year before the purported

acquisition of MThree.  Memorandum of Law in Support at 10, citing *Lankau*, 266 F.Supp.3d at

683.  Wiley also suggests that it had a "lawful purpose" in consummating the acquisition, thus

negating its scienter as to the tortious interference. *Id.* at 9.

As to the first point, it is inaccurate and not supported by personal knowledge, as it

cannot be said for a certainty when Wiley sought or entered into negotiations for MThree's

purchase, which for a transaction of this magnitude (over $128 million) it would be reasonable to

surmise at least a year's preparation.  But that is really beside the point, because the breach of

contract had a second phase that sprung at the moment of purported acquisition, whereupon

Plaintiff's right to an additional 2% sprung.  The breach and the acquisition occurred

simultaneously, or at the latest soon after when payment should have been made to Plaintiff, as

well as did Wiley's liability for tortious interference in that agreement.  A reasonable inference

of intentionality is also supported here by Wiley's cavalier attitude toward paying Plaintiff out of

his equity, including the email wherein Wiley admitted MThree's misrepresentations, but merely

advised Plaintiff to seek recoupment as against the individuals who made the misrepresentations.

Complaint at ¶ 43.  Plaintiff has alleged motive, benefit, and a reckless disregard displayed by

Wiley of his rights in these securities.

As to the second proposition regarding the "lawful purpose" defense, Wiley appears to

argue that it undertook economically advantageous actions, and thus any intent that it had to

procure a breach of the Employment Agreement was secondary, citing *N. Shipping Funds I, LLC

v. Icon Capital Corp.,* 2013 WL1500333 (SDNY 2013).  However, this defense is merely a

disguised version of the "economic interest" defense, where, in the context of tortious

interference claims, the Second Circuit has routinely refused to dismiss claims at the pleading

stage, as economic interest is more appropriately pled as an affirmative defense.  *See Barnet v.

Drawbridge Special Opportunities Fund LP*, 2014 WL4393320 (SDNY 2014) which specifically

analyzed *Northern Shipping Funds I, LLC*, in the context of tortious interference claims, and held "the so-called 'economic interest' defense is an affirmative defense that is not properly addressed on a motion to dismiss." *Barnet*, 2014 WL4393320 at *23; *and see id.* ("[s]everal courts in the Second Circuit have refused to apply the economic interest defense at the pleading stage to dismiss complaints for tortious interference with contract, explaining that the facts of the pleadings were not sufficiently developed to show entitlement to the defense") (citation omitted).

Therefore, Plaintiff has adequately alleged Wiley's tortious interference in his Employment Agreement, and the motion should be denied.

E. <u>Plaintiff's Conversion Claim Is Valid Against Both Defendants and Not Duplicative Since Wiley Is Not Subject to Plaintiff's Breach of Contract Claim and Conversion Encapsulates MThree's Pre-Contract Formation Acts</u>

Plaintiff pled a claim for conversion as against all parties.  Defendants object that this claim is duplicative of the breach of contract claim against them, but this is inaccurate and constitutes re-pleading of Plaintiff's Complaint.

The reality is that Plaintiff did <u>not</u> allege a breach of contract claim against Wiley, because Wiley was not a signatory to that contract. Neither Wiley nor MThree move to dismiss that breach of contract claim.  Thus, by the literal claims as pleaded, the conversion claim cannot be duplicative as against Wiley because Wiley is not subject to the breach of contract claim.  As that is the only argument advanced by Wiley, that portion of the motion should be denied.

As to whether the duplicative argument applies to MThree, who is subject to the breach of contract claim, the claim encapsulates pre-contract formation acts, including misrepresentations by MThree and its agents, that cannot otherwise be used to vary, explain, or produce damages under the breach of contract claim.  Thus, because the complained-of acts of MThree precede contract-formation, discovery will be widened to cover those acts as well under this claim.

When a conversion claim arises from separate acts outside the contract, it is not duplicative of a breach of contract claim, especially when misrepresentations and/or fraudulent activity is involved which induced entrance into a contract subject to the breach of contract claim.  *See e.g., Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.Supp.2d 609, 618 (SDNY 2003) ("[movant] plainly alleges wrongdoing that goes beyond breach of contract. [Movant] alleges that Plaintiffs made fraudulent misrepresentations and wrongfully appropriated his idea for a space-related business-to-business website.  This sort of misconduct is the essence of conversion"); *Alishaev Brothers inc. v. LA Girl Jewelry Inc.*, 2020 WL1489841 at *13 (SDNY 2020) (unreported) ("[t]he claim for conversion is not duplicative of the claim for breach of contract because the defendants engaged in fraudulent and wrongful conduct that goes beyond mere breach of contract by fraudulently inducing the plaintiff to enter into the contracts in the first place").

Plaintiff has alleged that he and MThree engaged in extensive pre-employment discussions over several months, during which several critical misrepresentations were made about his equity, inducing him to give up his equity at his former employer, J.P. Morgan. Complaint at ¶¶ 27-28.  Thereafter, MThree converted Plaintiff's equity when it purportedly sold his 3% to Wiley and kept the proceeds for itself. Thus, Plaintiff has pled misrepresentations that precede the contract and are otherwise independent wrongs needing redress, which will widen the scope of discovery in this action.

<u>**CONCLUSION**</u>

Plaintiff has adequately pled each claim at issue in Defendants' motion as to the legal merits and the motion should be denied.  In addition, Defendants have improperly supported their motion with reliance on and quotations from incompetent evidence not properly (or at all) submitted to the Court.  Defendants likely failed to include their purported contradictory and

exculpatory documents knowing that doing so would require the denial of their motion pending discovery and resolution of the multiple issues that these documents produce.  But in any event, this is a motion to dismiss – not a summary judgment motion – and these fact questions are not decided on a motion to dismiss.  For all of these reasons, Defendants' motion should be denied.


DATED: September 2, 2022

                      Respectfully submitted,

                      Capell Barnett Matalon & Schoenfeld LLP

By: _____

                      Travis M. Tatko (TT 7349)
                      1385 Broadway, 12th Floor
                      New York, NY 10036
                      Telephone: (212) 661-1144
                      Email: TTatko@CBMSLaw.com