**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JITENDRA VEKARIA, | Index No. 1:22-cv-03197 |
| Plaintiff, | |
| v. | |
| MTHREE CORPORATE CONSULTING, LTD., JOHN WILEY & SONS, INC., ECI PARTNERS LLP, ALEX HEADLEY, BENJAMIN TOWN, THOMAS SEYMOUR, AND RICHARD CHAPMAN, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT ECI PARNTERS LLP AND RICHARD CHAMPAN'S JOINT
MOTION TO DISMISS**

**Capell Barnett Matalon & Schoenfeld LLP**
Attorneys for Plaintiff
1385 Broadway, 12th Floor
New York, New York 10018
(212) 661-1144
TTatko@cbmslaw.com

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 3

     Defendant Wiley Putatively Acquires Defendant MThree ................................... 5

     Defendants' Improper Denial of Mr. Vekaria's MThree Stock ........................... 6

ARGUMENT .................................................................................................................... 7

    A.    Plaintiff's Claims Against ECI and Mr. Chapman Are Not Duplicative of His Breach of Contract Claim Against MThree Because Said Claim Is Not Asserted Against Movants, and Thus Movants Have No Standing to Raise This Defense ................................................ 7

    B.    ECI and Mr. Chapman Are Plaintiff's Employer Subject to New York Labor Law . 10

    C.    Plaintiff Has Sufficiently Alleged Claims for Misrepresentation Against Mr. Chapman Relating to Materially False Statements Collateral to the Contract, with Special Damages, and with Particularity ............................................................................ 14

    D.    Plaintiff Has More than Sufficiently Pled a Securities Claim as Receiving a Quid Pro Quo for Stock-Interest as Wages in a Timely Manner ........................................... 16

    E.    ECI and Mr. Chapman Move to Dismiss the Tortious Interference Claim on the Basis that They Made Money off Their Interference, but this Proves Their Liability ................. 21

    F.    Movants Fail to Establish that the Claim for Declaratory Judgment Pleaded Against Them Can Be Satisfied by Plaintiff's Breach of Contract Claim as Against MThree ........ 24

CONCLUSION................................................................................................................. 25

**TABLE OF AUTHORITIES**

**Page(s)**

Cases

*Alishaev Brothers inc. v. LA Girl Jewelry Inc.*, 2020 WL 1489841 at \*13 (S.D.N.Y. 2020)....... 10

*Alves v. Affiliated Care of Putnam, Inc.* 2022 WL 1002817 (S.D.N.Y. 2022)............................ 13

*Ansoumana v. Gristede's Operating Corp.*, 255 F.Supp.2d 184, 188 (S.D.N.Y. 2003).............. 11

*Aquino by Convergent Distributors of Texas, LLC v. Alexander Capital, LP*, 632 BR 7, 26

   (S.D.N.Y. 2021) .................................................................................................................. 16

*Ashcroft v. Iqbal*, 556 US 662, 678 (2009) ................................................................................ 7

*Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.Supp.2d 609, 618 (S.D.N.Y. 2003)....................... 10

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ........................ 7

*Barnet*, 2014 WL4393320 at \*23; *and see id* ...................................................................... 25, 26

*Bell Atl. Corp. v. Twombly*, 550 US 544, 570 (2007)................................................................ 7

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 20 (2d. Cir. 1996) ..... 9

*Brown v. Cerberus Capital Mgmt., L.P.,* 173 AD3d 513, 514-515 (1st Dept 2019).............. 16, 19

*Brown v. Showtime Networks, Inc.*, 394 F.Supp.3d 418, 446 (S.D.N.Y. 2019) .......................... 21

*Camofi Master LDC v. College P'ship, Inc.*, 452 F.Supp.2d 462 (S.D.N.Y. 2006)..................... 18

*Clifton v. Vista Computer Services, LLC*, 2002 WL 1585550 (S.D.N.Y. 2022) ........................... 8

*Dubin v. E.F. Hutton Group Inc.,* 695 F.Supp. 138, 146-147 (S.D.N.Y. 1988)......................... 23

*Hallet v. Stuart Dean Co.,* 481 F.Supp.3d 294 (S.D.N.Y. 2020).......................................... 13, 14

*KCG Americas LLC v. Brazilmed, LLC*, 2016 WL 900396 at \*3 (S.D.N.Y. 2016) .............. 18, 19

*Kimmel v. Schaefer*, 3224 AD2d 217, 218 (1st Dept 1996) *aff'd* 89 NY2d 258 (1996) ........ 16, 19

*Lankau v. Luxoft Holding, Inc.*, 266 F.Supp.3d 666, 678 (S.D.N.Y. 2017) .......................... 23, 24

*Lickteig v. Cerberus Management, L.P.,* 2020 WL1989424 (S.D.N.Y. 2020)............................. 20

*Maricultura Del Norte v. World Business Cap., Inc*., 159 F.Supp.3d 368, 377-78 (S.D.N.Y. 2015) ................................................................................................................... 9

*Matter of Lerner v. Credit Suisse Sec. (USA) LLC,* 193 AD3d 649, 650 (1st Dept 2021) ..... 13, 14

*Moon Joo Yu v. Premiere Power LLC*, 2018 WL456244 (S.D.N.Y. 2018) ........................... 20, 21

*Padilla v. Manlapaz*, 643 F.Supp.2d 302, 314 (E.D.N.Y. 2009)........................................... 11, 12

*Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998) ........................................... 26

*Ramiro Aviles v. S & P Global, Inc.,* 380 F.Supp.3d 221, 277 (S.D.N.Y. 2019) ........................ 20

*Ryan v. Kellog Partners Institutional Services*, 19 NY3d 1 (2012)........................................ 13, 14

*Savage v. Galaxy Media & Mktg Corp*., 2012 WL 2681423 (S.D.N.Y. 2012) ...................... 26, 27

*Schwartzco Enterprises LLC v. TMH Management,* LLC, 60 F.Supp.3d 331, 350 (E.D.N.Y. 2014) .................................................................................................................. 18

*Sheth v. New York Life Ins. Co*., 273 AD2d 72, 74 (1st Dept 2000)............................................ 18

*Strasser v. Prudential Secs., Inc.*, 218 AD2d 526 (1st Dept 1995) ............................................. 17

*Truelove v. Northeast Capital & Advisory Inc.*, 268 AD2d 648, 649-50 (3d Dept 2000), *aff'd* 95 NY2d 220 (2000) ................................................................................................. 13, 14, 15

*Vasto v. Credico (USA) LLC,* 2016 WL 4147241, at *4-*5 (S.D.N.Y. 2016)............................... 12

*Wallace v. BMO Nesbitt Burns Corp.*, 2002 WL 32063120 at *6 (S.D.N.Y. 2002) ................... 15

*Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 .2d 555 (2d Cir. 1985)..................... 23, 24

Statutes

29 USC § 203(d) ........................................................................................................................... 11

Business Corporations Law § 630 ........................................................................................... 11, 12

FRCP 8(d)(2) ................................................................................................................................... 8

FRCP 9(b) ...................................................................................................................................... 21

Rule 8(d)(3).................................................................................................................................... 8

Other Authorities

Black's Law Dictionary (11th Ed. 2019) ("Promise").................................................................. 15

## INTRODUCTION[1]

Plaintiff Jitendra Vekaria is a former employee of Defendant MThree.  He was approached and recruited by MThree to leave his gainful employment with J.P. Morgan and to give up substantial equity-based compensation that he would have received by staying with J.P. Morgan in order to join MThree, on the agreement and inducement that Mr. Vekaria would: (1) become an immediate stockholder in MThree, receiving up-front equity in the amount of a 1% interest in MThree, and (2) receive an additional 2% interest in MThree that would vest in 1% increments on the first and second anniversaries of his hire date; provided that if MThree were to be acquired before the additional equity vested, the remaining amount would vest automatically for a total percentage interest of 3%.

Less than a year after Mr. Vekaria's hiring, MThree was putatively acquired by Wiley, through the sale of all of MThree's outstanding stock to Wiley, but neither Wiley nor MThree paid Mr. Vekaria a dime for his MThree stock.  ECI Partners LLP ("ECI") controlled the management of MThree and was a majority shareholder of MThree stock and made out handsomely from this sale in part due to the fact that ECI did not have to share their profit with other stakeholders, such as the Plaintiff.  Mr. Vekaria left his employment soon after and brought this action seeking to enforce his rights as against all bad actors, *i.e.*, the named Defendants.

This course of unlawful and inequitable conduct aimed at duping Mr. Vekaria out of millions of dollars was commenced and facilitated by ECI, the controlling shareholder of MThree, and individuals.  These individuals are named defendants in this suit, and particularly as

---

[1] Some of the below stated facts and law are duplicative of Plaintiff's other oppositions to the three concurrent motions to dismiss filed by some of the Defendants. Plaintiff yet sets these facts forth in full for context as well as the record in this matter. Further, it appears that some of the movants have taken caselaw and arguments from MThree and Wiley's first motion to dismiss, denied as moot by this Court. Thus, the opposition to those points are largely the same here.

to the instant motion, the named defendant Mr. Chapman, who is the controlling partner of ECI.

Mr. Chapman personally participated in inducing, arranging, and engaging with his Co-

Defendants to employ Mr. Vekaria at MThree using alluring and patently false promises that Mr.

Vekaria would receive stock in his new company should he quit his job and accept an offer of

employment with MThree.  Mr. Chapman now moves to dismiss these claims because, false

though his promises were, he wants to get a free pass from this Court.  But for the reasons set

forth below, the Court should not permit him to do as he pleases with absolutely no consequence.

He is joined on the motion by his company ECI, which primarily makes arguments on

behalf of MThree and Wiley even though those Defendants have filed their own motion to

dismiss, separately opposed, and ECI has no standing to raise any such defenses on their behalf.

ECI moves to dismiss Counts Three and Four ("Labor Law" claims), Eight (Interference

with a Contract), Nine (Conversion), and Ten (Declaratory Judgment). Mr. Chapman moves to

dismiss the same claims with the addition of Counts Five (Fraudulent Inducement), Six

(Negligent Misrepresentation) ("Misrepresentation" claims), and Seven ("Securities" claim).

The Court should deny the motion in whole for the following reasons:

A.      ECI and Mr. Chapman only move to dismiss, together, Counts Three through Ten
of the First Amended Complaint ("FAC").  Yet, they raise as a basis for dismissal of all of these
claims the ostensibly duplicative nature of Count One *vis-à-vis* the other seven.  Yet, Counts One
is exclusively pled against another Defendant, MThree.  There can be no basis for a duplicative
analysis when the alleged duplicative claims are pleaded only against other parties and not the
movants.

B.      ECI and Mr. Chapman move to dismiss the Labor Law claims on the basis that (i)
neither was Mr. Vekaria's employer—but this is incorrect because this label has been interpreted
to mean any person who acts in the interest of an employer; and (ii) stock interests are not
wages—but this proposition is specifically contradicted by on-point caselaw.

C.      Mr. Chapman alone moves to dismiss the Misrepresentation torts because (i) the
statements constitute promises of future conduct—but this is not in conformity with the
pleadings and otherwise inapplicable when the promise relates to a material existing fact;
(ii) does not quote the exact verbiage Mr. Chapman used—also immaterial because that is not

required under heightened pleading; and (iii) he had no special relationship—but this cannot be determined at the pleadings stage and is otherwise supported by the parties' knowledge-gap.

D.      Mr. Chapman alone moves to dismiss the Securities claim on the basis that (i) it is untimely—but such untimeliness cannot be determined from the face of the FAC; (ii) that Mr. Vekaria did not "purchase" stock, although this is contradicted by caselaw; and (iii) is not pled with particularity—though this is patently not accurate.

E.      ECI and Mr. Chapman move to dismiss the Tortious Interference claim on the basis that ECI and Mr. Chapman made money off their interference, but this is not the test and, if anything, further proves their liability.  They also argue in a footnote that Mr. Vekaria did not have actual possession of the equity at issue, but this is incorrect.

F.      ECI and Mr. Chapman move to dismiss the Declaratory Judgment claim that seeks consequential relief in the form of rescission because Mr. Vekaria can purportedly be made whole with money damages. But this is inaccurate as to the procedural posture at issue herein because the breached contract was not with ECI or Wiley, but just MThree.  Thus, Plaintiff does not have an adequate remedy at law as against these persons who received equity that properly belonged to Mr. Vekaria—these deals were made at his expense and to the unjust benefit of others and must be unwound. In addition, neither party argues against the claim itself, but merely the relief sought.

## STATEMENT OF FACTS

Plaintiff began employment at MThree on or about January 7, 2019, as a salesperson in MThree's sales department for North America.  First Amended Complaint ("FAC") at ¶ 22 (Dkt. No. 63).[2]  Prior to the joining MThree, Plaintiff engaged in extensive pre-employment discussions and negotiations with each of Defendants Headley, Town, Seymour, and Chapman. *Id.* at ¶ 27.  Each of Defendants Headley, Town, Seymour, and Chapman were employed by and/or agents of MThree at all relevant times leading up to, and subsequent to, Mr. Vekaria's hiring by MThree.  *Id.* at ¶ 26.  Each of Headley, Town, Seymour, and Chapman were actively involved in the hiring of Mr. Vekaria.  *Id.*

---

[2] The following select factual allegations are taken from Plaintiff's FAC, and capitalized terms are used with the same meaning as defined in that document.

These pre-employment discussions stretched over several months.  During such time, Plaintiff was employed by J.P. Morgan.  *Id.*  At numerous times during these pre-employment discussions, Plaintiff informed MThree and each of Defendants Headley, Town, Seymour, and Chapman that if he left his then-current employment with J.P. Morgan, Plaintiff would lose a very substantial amount of equity-based compensation from J.P. Morgan, and that Plaintiff would not leave his employment with J.P. Morgan and join MThree unless he received a meaningful equity position in MThree.  *Id.* at ¶ 28.  On January 2, 2019, Mr. Headley, the Chief Executive Officer of MThree, sent an email to Mr. Vekaria, which was copied to Mr. Seymour.  *Id.* at ¶ 29.  In such email, Mr. Headley confirmed and represented that Plaintiff would receive an immediate, fully vested stock issuance comprising 1% of the fully diluted capital stock of MThree (the "Initial Stock") and additional stock comprising an additional 2% of the fully diluted capital stock of MThree, which was to be issued to Plaintiff immediately upon an acquisition of MThree, or otherwise in 1% increments upon the first and second anniversaries of Mr. Vekaria's hire date (the "Additional Stock"; the Initial Stock and the Additional Stock, the "MThree Stock").  *Id.* at ¶ 25.  Mr. Headley directed Mr. Seymour to prepare the Employment Agreement to reflect such representations and understandings.  *Id.*  Mr. Seymour also communicated directly with Plaintiff regarding the terms of the Employment Agreement, including specifically as to the equity that Plaintiff needed to receive in order to join MThree. *Id.*

On or about January 7, 2019, Plaintiff and MThree entered into the Employment Agreement.  *Id.* at ¶ 23.  The Employment Agreement was signed by Plaintiff and by Defendant Seymour on behalf of MThree.  *Id.*  Pursuant to the Employment Agreement, MThree agreed to provide Plaintiff with the Initial Stock, effectively immediately upon the execution of the

Employment Agreement.  *Id.* at ¶ 24.  In addition, pursuant to the Employment Agreement,

MThree agreed to provide Plaintiff with the Additional Stock, comprising an additional 2% of

the fully diluted capital stock of MThree, which was to be issued to Plaintiff immediately upon

an acquisition of MThree, or otherwise in 1% increments upon the first and second anniversaries

of Mr. Vekaria's employment – January 7, 2020, and January 7, 2021, respectively.  *Id.* at ¶ 25.

Defendant Wiley Putatively Acquires Defendant MThree

On January 1, 2020, MThree was putatively acquired by Wiley.  *Id.* at ¶ 31.  Upon

information and belief, immediately prior to the Putative Wiley Acquisition, ECI was the

majority shareholder of MThree, and each of Defendants Headley, Town, Seymour, and

Chapman held stock, or comparable equity rights or interest, in MThree.  *Id.* at ¶ 32.

Wiley is a publicly traded company listed on the New York Stock Exchange.  *Id.* at ¶ 33.

In or about January of 2020, Wiley ostensibly acquired 100% of the MThree stock in a $129

million transaction.  *Id.* at ¶¶ 34-35.  Plaintiff's equity would therefore be valued at

$3,858,000.00, or 3%.  *Id.* at ¶ 36.  At no time did Plaintiff agree to sell or transfer his equity in

MThree to Wiley in conjunction with the Putative Wiley Acquisition, nor did Plaintiff sign any

documents to any such effect.  *Id.* at ¶ 40.

In conjunction with the Putative Wiley Acquisition, Mr. Vekaria received a transaction

bonus, which MThree awarded to him and many other employees of MThree, regardless of

whether or not they held stock ownership in MThree.  *Id.* at ¶ 39.  In connection with such

transaction bonus, Mr. Vekaria received a letter from MThree, stating that the transaction bonus

was made "in recognition of [Mr. Vekaria's] support to [MThree] to date" and for Mr. Vekaria's

"support and efforts in helping to make this transaction a success."  *Id.*  This letter said nothing at

all about Mr. Vekaria's stock in MThree, nor made any mention at all that the transaction bonus
was somehow related to or in consideration for Mr. Vekaria's MThree Stock.  *Id.*

Following the closing of the Putative Wiley Acquisition, Plaintiff remained an employee
of MThree for four more months, until April 2020.  *Id.* at ¶ 41.  At the time of his separation of
employment, Plaintiff had spent approximately one year and three months of continuous
employment at MThree.

<u>Defendants' Improper Denial of Mr. Vekaria's MThree Stock</u>

Subsequent to his separation of employment with MThree, Plaintiff sought to clarify the
status of his MThree Stock with MThree and Wiley as well as certain tax issues resulting from
the transaction.  *Id.* at ¶ 42.  These discussions were escalated to senior members of MThree's
and Wiley's management team, and included Mr. Town and Mr. Seymour, who remained
employed with MThree subsequent to the Putative Wiley Acquisition.  *Id.*

Over the course of these discussions, Wiley and MThree took the position that Plaintiff
was somehow not a stockholder, and that Plaintiff was not entitled to any compensation on
account of his MThree Stock.  *Id.* at ¶ 43.  In fact, Steven Sklar, Vice President of Global Tax at
Wiley, wrote in email correspondence where Mr. Town was copied that Mr. Vekaria's claims
were based in "fraud or fraudulent inducement" and that Plaintiff should "look to sellers of
MThree to address these claims."  *Id.*  This email correspondence effectively serves as an
admission that Plaintiff was misled by the "sellers," which include Mr. Town.  *Id.*  In turn, ECI –
the apparent majority stockholder of MThree prior to the putative acquisition – has rejected any
claims of liability whatsoever on account of Mr. Vekaria's MThree Stock.  *Id.*

To date, Plaintiff has not received a single stock certificate or any compensation
whatsoever on account of his MThree Stock.  *Id.* at ¶ 45.

Plaintiff has held constructive ownership of the MThree Stock since he properly executed the Employment Agreement. Defendants' improper refusal to acknowledge and/or issue the shares does not invalidate his ownership. *Id.* at ¶ 46. Nor does the Putative Wiley Acquisition, as Plaintiff has never transferred any of his stock in MThree at any time. *Id.* Indeed, MThree's and Wiley's naked assertions that Wiley has somehow acquired "100%" of MThree's stock have been, and continue to be, misleading and untrue. *Id.*

## ARGUMENT

A complaint must only allege enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 US 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 US 662, 678 (2009). A court must accept all factual allegations contained therein and draw all reasonable inferences in the non-movant's favor. *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

A. Plaintiff's Claims Against ECI and Mr. Chapman Are Not Duplicative of His Breach of Contract Claim Against MThree Because Said Claim Is Not Asserted Against Movants, and Thus Movants Have No Standing to Raise This Defense

ECI and Mr. Chapman (sometimes referred to here collectively as "Movants"), spend an inordinate amount of time discussing the purportedly duplicative nature of the claims as pleaded against them *vis-à-vis* other claims pleaded against other parties, namely MThree. (Movants' Mem. of Law in Supp. at pp. 6-9.) Indeed, Plaintiff has pleaded his breach of contract claim only against MThree, and Movants do not have standing to raise the purported duplicative nature of the claim – a breach of contract claim only asserted against MThree – as a defense to the claims as pleaded against them. Simply put, if a claim is duplicative as against a party, it may be subject to dismissal as against that party, but that is not the case here where the claims is pled

7

against another party.  For this reason, the entire first prong of Movants' Mem. of Law in Supp.

("Point I") is unsupported, but their caselaw is briefly analyzed below.

As an initial matter, Movants fault Mr. Vekaria for alternative pleading (*id.* at 6).

Alternative pleading is specifically allowed under Federal Rule of Civil Procedure ("FRCP"),

Rule 8. In specific, FRCP 8(d)(2) states:

> *Alternative Statements of a Claim or Defense*. A party may set out 2 or more statements
> of a claim or defense alternatively or hypothetically, either in a single count or defense or
> in separate ones. If a party makes alternative statements, the pleading is sufficient if any
> one of them is sufficient.

And Rule 8(d)(3): "*Inconsistent Claims or Defenses*. A party may state as many separate claims

or defenses as it has, regardless of consistency." *Id*.  Thus, Movants attempt to find fault with

Plaintiff's FAC alleging that either Mr. Vekaria had a contract with MThree, or barring that, the

"MThree" Defendants made misrepresentations to him.

As to the claim for Fraudulent Inducement, Mr. Chapman cite *Clifton v. Vista Computer

Services, LLC*, 2002 WL 1585550 (S.D.N.Y. 2022) to show that dismissal is proper when plead

in conjunction with breach of contract.  (Mem. of Law in Supp. at 6-7.)  There, in order to

dismiss the claim, the Court had to resort to reviewing the contract itself to determine whether

the representations made were "extraneous" to the contract at issue. *Id.* at *3-4.  Although

submitted on a motion to dismiss, since both parties submitted the contract at issue, the court

reviewed the same. *Id.*  Here, no contract has been submitted. In fact, there is a concrete factual

dispute between Plaintiff, MThree, and Wiley regarding the terms of the contract, and no party

has submitted their alleged version thereof.  (*See* Plaintiff's Memorandum of Law in Opposition

to Wiley and MThree's motion to dismiss, filed on the same date herewith.)

Mr. Chapman cavalierly cites *Maricultura Del Norte v. World Business Cap., Inc*., 159

F.Supp.3d 368, 377-78 (S.D.N.Y. 2015) for the proposition that fraud cannot be plead in

conjunction with breach of contract as if it were a bright line rule, but this is inaccurate.  The test has a much finer point on it than argued, namely that fraud may be pleaded along with breach of contract if (i) there was a separate legal duty outside the contract; (ii) fraudulent misrepresentations collateral to the contract; or (iii) seeks special damages outside of the contract.  *See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 20 (2d. Cir. 1996).  As above, point (ii) cannot be determined at this early juncture because no contract is before the Court.  Separately, there are special damages incurred outside the contract in the form of the lost equity that Mr. Vekaria gave up in his former employer because he relied on the false statements of Mr. Chapman, which damages are likely unrecoverable under a breach of contract claim as against MThree, whose remedy is the bargained-for-exchange thereunder.

For the same reasons, the Negligent Misrepresentation claim is non-duplicative.  This is true even though Mr. Chapman states, "Mr. Vekaria admits that his claim for negligent misrepresentation arises from promises made <u>in</u> his employment agreement.  (Memorandum in Support at 7) (underline added).  This is an inaccurate re-pleading of Plaintiff's FAC, which, as above, alleges misrepresentations outside of the contract.

When a conversion claim arises from separate acts outside the contract, it is not duplicative of a breach of contract claim, especially when misrepresentations and/or fraudulent activity is involved which induced entrance into a contract subject to the breach of contract claim.  *See e.g., Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.Supp.2d 609, 618 (S.D.N.Y. 2003) ("[movant] plainly alleges wrongdoing that goes beyond breach of contract. [Movant] alleges that Plaintiffs made fraudulent misrepresentations and wrongfully appropriated his idea for a space-related business-to-business website.  This sort of misconduct is the essence of conversion"); *Alishaev Brothers inc. v. LA Girl Jewelry Inc.*, 2020 WL 1489841 at *13

(S.D.N.Y. 2020) ("[t]he claim for conversion is not duplicative of the claim for breach of contract because the defendants engaged in fraudulent and wrongful conduct that goes beyond mere breach of contract by fraudulently inducing the plaintiff to enter into the contracts in the first place").

Plaintiff has alleged that he and Mr. Chapman engaged in extensive pre-employment discussions over several months, during which several critical misrepresentations were made about his equity, inducing him to give up his equity at his former employer, J.P. Morgan.  FAC at ¶¶ 27-28.  Thereafter, Mr. Chapman converted Plaintiff's equity when he obtained money from the sale of MThree to Wiley and kept the proceeds for himself.  Thus, Plaintiff has pled wrongs that precede the contract and are otherwise independent wrongs needing redress, which will widen the scope of discovery in this action.

Movants argue that the same damages are sought as breach of contract with respect to Declaratory Judgment, but this is contradicted below in Subpart F, *infra*.

B.  ECI and Mr. Chapman Are Plaintiff's Employer Subject to New York Labor Law

Mr. Chapman and ECI are Mr. Vekaria's "Employer" for the purposes of the Labor Law claims.  Movants argue that there is a short test that definitively establishes whether one is or is not an employer (Mem. of Law in Supp. at 9-10 (listing four factors), but this is not the case.  *See Padilla v. Manlapaz*, 643 F.Supp.2d 302, 314 (E.D.N.Y. 2009) ("[h]owever, these factors are not exclusive . . . . Instead, courts look at the totality of the circumstances in determining whether the defendant is an employer") (citation omitted).

Indeed, the Southern District has held, "The terms ["employer/ee"] are to be expansively defined, with "striking breadth," in such a way as to 'stretch ... the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Ansoumana v. Gristede's Operating Corp.*, 255 F.Supp.2d 184, 188 (S.D.N.Y.

2003).  Under the Fair Labor Standards Act ("FLSA") (to be interpreted just as in New York

Labor Law claims), the definition of "employer" is "any person acting directly or indirectly in

the interest of an employer."  *See id. citing* 29 USC § 203(d).  The test is as expansive as the

realities of economics called for, as concede by Movants, including imposing "employer"

liability on those who "hir[e] and train staff," arrange for the "conditions of employment," and

handle "wages."  *Padilla*, 643 F.Supp.2d at 315.

Movant's "hard" and "soft" power exerted within the corporation (MThree) are two

additional factors in this analysis.  *See Vasto v. Credico (USA) LLC,* 2016 WL 4147241, at *4-*5

(S.D.N.Y. 2016).  Hard power being defined as: "The first is the scope of the individual's

'operational control' over 'employment-related factors such as workplace conditions and

operations, personnel, or compensation.'"  *Id.* at *4.  The second being "the extent to which he

has authority to control employees, even if he does not exercise it."  *Id.*

Here, Plaintiff alleges that Mr. Chapman was "actively involved in the negotiations

leading to Mr. Vekaria's hiring."  FAC at ¶¶ 2; 26.  These discussions lasted months.  FAC at ¶

27.  That Mr. Chapman was a member of MThree's Board of Directors.  FAC at ¶ 18.  Mr.

Chapman made materially and purposefully or negligently false statements regarding Mr.

Vekaria's compensation to induce him to their employ.  FAC at ¶¶ 73-77.  And that Mr.

Chapman authored and/or contributed to the employment agreement with said terms.  FAC at ¶

30.  Plaintiff also alleges that ECI and Mr. Chapman were the largest shareholders of MThree,

which, recognizing that this alone is not sufficient for employer liability, still should be

considered in the "soft power" category of liability.  FAC at ¶¶ 32, 34.

Movants argue that they may not be found liable under Business Corporations Law § 630

without a prior judgment or required notice, but this argument does not present a complete

defense to the Labor Law claims because the imposition of "employer" creates liability under the Labor Law regardless of shareholder status under BCL § 630, as is discussed in Movants' caselaw as well, at *Alves v. Affiliated Care of Putnam, Inc.* 2022 WL 1002817 (S.D.N.Y. 2022) at *15, fn. 10 ("[t]he Court further notes that Section 630(a) may not be relevant if [defendant-shareholder] qualifies as an "employer" under New York Labor Law and the FLSA").  This is because BCL § 630 seeks to impose liability on non-employer shareholders, which is not strictly the case here as shown above.

Movants next argue that the Mr. Vekaria's stocks were not "wages" (Mem. of Law in Supp. at 12-13) relying on *Matter of Lerner v. Credit Suisse Sec. (USA) LLC,* 193 AD3d 649, 650 (1st Dept 2021).  However, *Matter of Lerner* primarily relies on, and is analogous to, *Truelove v. Northeast Capital & Advisory Inc.*, 268 AD2d 648, 649-50 (3d Dept 2000), *aff'd* 95 NY2d 220 (2000), which is an older New York Court of Appeals case that has since been expanded in *Ryan v. Kellog Partners Institutional Services*, 19 NY3d 1 (2012) to encompass actions such as that at bar.  This expansion of equity-as-wages has been recognized in the Southern District by *Hallet v. Stuart Dean Co.,* 481 F.Supp.3d 294 (S.D.N.Y. 2020), also cited by Movants.

In *Hallet*, the Southern District held that *Truelove* was expanded by the Court of Appeals of New York to encompass actions by employees regarding their equity when (1) the employee was promised a non-discretionary bonus to entice him to switch jobs, which was not paid; (2) the bonus was linked to his labor or services; and (3) had been earned and vested.  *See Hallet*, 481 F.Supp.3d at 309-310 (discussing and distinguishing *Truelove*).  Primarily, the *Hallet* Court found that a key distinction between the newer *Ryan* and the older *Truelove* was that some

former employees had been making equity-as-wages claims for equity that "depended solely upon his employer's overall financial success" and were "entirely discretionary." *Id.* at 309.

In support of its motion, Movants argue that (1) on analogy to *Matter of Lerner*, Defendant cannot make out a claim. As above, *Matter of Lerner* concerned facts that are not analogous and have since been expanded upon. Primarily, the distinction can be seen in the type of equity at issue in *Matter of Lerner*, which was (a) a type of "deferred equity compensation" and (2) "was dependent on the future market value of the company." *Matter of Lerner*, 193 AD3d at 32. That court also exclusively relied on *Truelove* for this proposition, which is notable because in *Truelove*, the equity-compensation at issue was a "bonus/profit sharing pool," wherein all the employees were entitled to withdraw, at the discretion of their employer, a set amount of money per annum depending on the company's success. *Truelove v. Northeast Capital & Advisory*, 95 NY2d at 222-223. The *Truelove* court held that such fluctuations of the market and the discretionary nature of the "equity" weighed against considering that interest as a "wage" under the labor law. *Id.*

Neither the *Matter of Lerner* case nor that of *Truelove* are analogous to that at bar where Plaintiff alleges that he is entitled to 3% of the entire company of MThree, which vested at two different points, one being his commencement and the second being the sale of MThree. The amount of this equity did not fluctuate with the market, as it was not a money-pooling or profit-sharing scheme, and unlike in *Truelove*, was not discretionary.

Movants also argue that sign-on bonuses in the form of equity are not wages, citing *Wallace v. BMO Nesbitt Burns Corp.*, 2002 WL 32063120 at *6 (S.D.N.Y. 2002) (unreported). As above, Plaintiff never alleged that his equity was a "sign-on" bonus, but that it was part and parcel of his compensation package that vested at different periods over the course of his

employment, at year 0, year 1, and year 2, barring any acquisition whereupon all equity would

vest immediately.  The *Wallace* Court also relied exclusively on *Truelove* for its holding, which

has since been expanded as recognize in *Hallet* and discussed above.

C.   Plaintiff Has Sufficiently Alleged Claims for Misrepresentation Against Mr. Chapman
     Relating to Materially False Statements Collateral to the Contract, with Special Damages,
     and with Particularity

Directors and insiders of corporations that make misrepresentations about stock-interests

are proper parties for misrepresentation claims.  *See Kimmel v. Schaefer*, 3224 AD2d 217, 218

(1st Dept 1996) *aff'd* 89 NY2d 258 (1996) (misrepresentations actionable based on corporate

insider's superior information to plaintiff stock purchaser); *see also Brown v. Cerberus Capital*

*Mgmt., L.P.,* 173 AD3d 513, 514-515 (1st Dept 2019) (misrepresentations claims against

employer viable when it refused to honor profit sharing agreement with employees and instead

forcibly repurchased their interest at nominal rate).

Mr. Chapman moves to dismiss the Misrepresentation claims on three grounds: (1) they

were misrepresentations about future conduct; (2) are not particularized; and (3) that Mr.

Chapman had no special relationship with him. Each of these propositions is either incorrect or

inapposite to the allegations presented in the FAC.

First, Mr. Chapman over-plays the authority regarding promises of future conduct, as

disclosed by this Court's recent rulings.  In *Aquino by Convergent Distributors of Texas, LLC v.*

*Alexander Capital, LP*, 632 BR 7, 26 (S.D.N.Y. 2021) this Court held:

> While it is true that 'a mere promissory statement as to what will be done in the
> future does not constitute a material misrepresentation of fact, a promise made
> with a preconceived and undisclosed intention of not performing it [does]'
> because 'it constitutes a misrepresentation of material existing fact upon which an
> action [for fraudulent inducement] may be predicated' (citation omitted)

It is also inaccurate, as a precondition to this argument, that Plaintiff even pled promises

of future conduct.  Mr. Chapman's argument is tautological because he argues that because he

promised to do something, said promise related to the future, and is thus barred.  But by their nature all promises relate to the future, and under the espoused theory no fraudulent promise would be actionable.[3]  This is an unreasonable interpretation.

Mr. Chapman cites caselaw dismissing actions on this basis (such as *Strasser v. Prudential Secs., Inc.*, 218 AD2d 526 (1st Dept 1995), but substantively fails to address how Plaintiff's pleadings comport with said caselaw or constitute promises of future conduct. Mr. Chapman merely re-frames Plaintiff's pleadings as "[Mr. Chapman] lied about MThree's intent to perform under the employment agreement."  (Mem. of Law in Supp. at 13.)  As above, even if this were the case, such is actionable in and of itself and otherwise such claims are not subject to Plaintiff's breach of contract claim as against other parties (MThree).

Next, Mr. Chapman argues, using a long list of string-citations without clear relevance to the facts at hand, that the Misrepresentation claims are not pled adequately. (Mem. of Law in Supp. at 14-15.)  It appears that Mr. Chapman's objection is that he was not specifically quoted in the FAC. (*Id.* at 15 ("[a]t no point does Mr. Vekaria allege any purported misrepresentation specifically made by Mr. Chapman").  Mr. Chapman's caselaw does not support this contention. Requiring a plaintiff to specifically quote someone is not only not a requirement under the law, but due to our imperfect memories as human beings, any such attempt at exact quotation is almost certainly fruitless, and may in fact be prejudicial to one's case if not exactly worded as was stated.  *See KCG Americas LLC v. Brazilmed, LLC*, 2016 WL 900396 at *3 (S.D.N.Y. 2016) "Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map" (citation omitted); *see also Schwartzco Enterprises LLC v. TMH Management,* LLC, 60 F.Supp.3d 331, 350 (E.D.N.Y. 2014) (permitting "group pleading" where group was alleged

---

[3] *See* Black's Law Dictionary (11th Ed. 2019) ("Promise") "1. . . . a person's assurance that the person <u>will</u> or <u>will not</u> do something (emphasis added).

to have contributed to a writing containing misrepresentations).  Plaintiff has adequately pleaded the specifics forms, types, and content of the misrepresentations made by Mr. Chapman, which is sufficient even under heightened pleading.

Movants' caselaw *Camofi Master LDC v. College P'ship, Inc.*, 452 F.Supp.2d 462 (S.D.N.Y. 2006) concerns promises to secure future financing when entering into a contract (*id.* at 476) and *Sheth v. New York Life Ins. Co.*, 273 AD2d 72, 74 (1st Dept 2000) merely stands for the generalized proposition that conclusory statements should not survive dismissal, neither of which is the case here.

Mr. Chapman argues that the lack of a special relationship is fatal to Plaintiff's claim, but again there is no bright-line rule holding so.  *See KCG Americas LLC,* 2016 WL 900396 at *7 ("[a] complaint that contains sparsely pleaded allegations of a special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where the complaint emphatically alleges the other two factors") (quotation marks omitted).  Most importantly, however, under New York Law, special relationship inquiries are factual and not subject to motions to dismiss. *See Brown*, 173 AD3d at 514-515.

The caselaw cited in support of the motion primarily deals with arms-length business transactions, not the fact scenario presented here where Mr. Vekaria was induced to become an employee by the principals of MThree.  Specifically, as in *Kimmel*, *supra*, a special relationship can be alleged as against a corporate principal when there is an information gap between the parties, not otherwise tied to their employment relationship.

D.  <u>Plaintiff Has More than Sufficiently Pled a Securities Claim as Receiving a Quid Pro Quo for Stock-Interest as Wages in a Timely Manner</u>

Plaintiff timely filed the instant action after conducting a reasonable investigation into what happened to his stock after he left MThree, and after investigating why he was not issued

new stock or cashed out at the time of his resignation in April 2020.  FAC at ¶¶ 42-44.  Under

prevailing law, the statute of limitation does not begin to commence until the end of a reasonable

investigation into fraudulent activity.  *See e.g., Lickteig v. Cerberus Management, L.P.,* 2020

WL1989424 (S.D.N.Y. 2020); *Moon Joo Yu v. Premiere Power LLC*, 2018 WL456244

(S.D.N.Y. 2018)*.*  On a motion to dismiss, dismissal due to a statute of limitations is "often

inappropriate" and should only be done in "extreme circumstances" when the "the facts on the

face of the complaint . . . are sufficient to establish a 'duty of inquiry' as a matter of law."  *See*

*Ramiro Aviles v. S & P Global, Inc.,* 380 F.Supp.3d 221, 277 (S.D.N.Y. 2019) (citations

omitted).

In this case, Movants have not met their burden which required them to prove, on the face

of the Complaint and as a matter of law, when Plaintiff should have begun and/or concluded his

investigation into their acts such that he could plead all elements of his claim.  It is respectfully

submitted here that they cannot do so.

In *Lickteig*, *supra*, the Southern District found that where a defendant sold its business to

a competitor, the sale itself did not give rise to an inference of wrong-doing on behalf of the

defendants because "on its face" the sale did not "indicate . . . misconduct."  *Lickteig,*

WL1989424 at *7.  "Hence, this information would not have 'prompted a reasonably diligent

plaintiff to begin investigating.'"  *Id.* (citation omitted).

In a similar case, the plaintiff-investor did not receive payment at the promised date, but

nonetheless the Southern District did not hold that this date was the beginning of the limitations-

period for a 10(b)-5 claim.  *Moon Joo Yu*, WL456244 at *6-9.  The Southern District specifically

held that where the defendant had failed to pay on an investment, the cause of action arose not

when a reasonable investor could have begun investigating at the missed-payment date, but when

such an investigation would reasonably show that the failure to pay was fraudulent, and scienter could be sufficiently alleged.  *Id.* at *5.

Indeed, to the extent that the furthest-most point of the two-year limitations period cannot be reasonably defined at an exact date from the pleadings, this must be resolved in discovery. *See Brown v. Showtime Networks, Inc.*, 394 F.Supp.3d 418, 446 (S.D.N.Y. 2019) (when issue of fact as to inquiry notice is raised in a motion to dismiss, it must be "fleshed out in discovery" and then "raise[d] . . . again in a motion for summary judgment").

Plaintiff did not know, and had no reason even to suspect, as shown definitively on the face of the FAC, that he had been defrauded and his equity-status had been misrepresented to him as of the date of sale of his then-current employer MThree to Wiley.  In fact, as alleged in the FAC, Plaintiff did not even begin to suspect something was amiss until he started to do his taxes in 2021, at which point he began investigating the status of his equity.  FAC at ¶ 42.  In his Complaint, Plaintiff alleges that he was still employed at MThree at the time of the purported sale in January of 2020.  FAC at ¶¶ 31, 41.  He further alleges that he received a payment of money from MThree at or about the same time of this purported acquisition (though Plaintiff disputes that this payment was made in consideration for his 3% equity in MThree).  *Id.* at ¶ 39. At that time, it is reasonable to opine that Plaintiff could have thought a number of things, including that his stock would be transferred to his new employer Wiley, that he would be retaining his stock in MThree (or receiving comparable stock in Wiley), or even that he would be paid out at a later date, including once he left his employment.  None of this is patently unreasonable, nor did Plaintiff apparently have cause for concern at the transaction date as he remained employed for an additional four months. Indeed, his allegations regarding what occurred once he resigned from MThree show his state of mind at the time, and that he clearly

did not know he was defrauded until after he discussed his equity with MThree and Wiley post-resignation.

Once Plaintiff resigned in April of 2020, he alleges that he reached out to MThree and Wiley because he had encountered tax issues resulting from the purported acquisition.  FAC at ¶ 42.  These discussions went on for a period of time as they wound through senior management of Wiley and MThree.  *Id.* at ¶ 43.  It was during the course of these conversations that Wiley finally denied having any liability for Plaintiff's equity, and further, explicitly told him that Plaintiff's "claims were based in 'fraud or fraudulent inducement' and that Mr. Vekaria should 'look to sellers of MThree to address these claims.'"  *Id.*  Plaintiff alleges that he could satisfactorily plead a 10(b)-5 claim in 2021. *Id.* at ¶ 91.  Plaintiff filed this action in April of 2022.  Even if these conversations occurred in April of 2020 (month of resignation), though Plaintiff alleges these conversations occurred over a period of time into 2021, Plaintiff would still be within the limitations-period of two years.  These claims can and should be resolved in discovery.

Movants next argue, in relation to the Security claim, that Plaintiff has not stated a cause of action because Mr. Vekaria was not a "purchaser of stock." (Mem. of Law in Supp. at 18-19.) Movants misread their cited authority.

When a plaintiff enters into a "quid pro quo offered to induce plaintiff into the employ of [defendant]," such an offering is a covered transaction under the Exchange Act. *Dubin v. E.F. Hutton Group Inc.,* 695 F.Supp. 138, 146-147 (S.D.N.Y. 1988) (citation omitted) (also cited in Movants' Mem. of Law in Supp. at 18).  In that case, the Southern District specifically held that where a defendant misrepresented the vesting conditions of securities in connection with an offer of employment, which would affect whether or not a potential employee would accept an offer of

employment, such a "transaction" was a "purchase" of a "security." *Id.* at 147.  It is of note that

the stock offering in *Dubin* was almost identical to that at bar, where the plaintiff's equity was

misrepresented, and the company informed him that upon its acquisition his stock was forfeit.

*See discussion at Lankau v. Luxoft Holding, Inc.*, 266 F.Supp.3d 666, 678 (S.D.N.Y. 2017) (also

cited by Movants at p. 18 of their Mem. of Law in Supp.).

Indeed, the *Dubin* Court held, citing *Yoder v. Orthomolecular Nutrition Institute, Inc.*,

751 .2d 555 (2d Cir. 1985), that "a contract for the issuance or transfer of a security may qualify

as a sale under the securities laws even if the contract is never fully performed . . . . We see no

reason why . . . an individual who commits herself to employment by a corporation in return for

stock or the promise of stock should not be considered an investor." *Id.* at 144.  The *Dubin*

Court specifically found that when an employee accepts employment in reliance on the promise

for the issuance of security, he or she is acting as an "investor" who depends on the

representations made by the transferor of the security.  *Id.* at 145.

As to Movants' cited case, *Lankau*, *supra*, that case is not on-point because the

plaintiff did not allege that there had ever been a covered transaction, but rather that he had not

received unvested stock options.  *Lankau* at 679.  This is not the case here where Plaintiff has

alleged that the initial stock vested upon entering the Employment Agreement and that he

constructively possessed the equity throughout his employment and even to this day.  FAC at

¶ 46.  If this were not the case, Movants' mere refusal to acknowledge his equity ownership

would defeat his claim, which interpretation would not only be unsound, but unjust.

Therefore, pursuant to *Dubin*, Plaintiff has alleged a covered transaction that entails a

*quid pro quo* of labor for securities, and thus Defendants are liable under 10(b) and 10(b)-5.

Movants next argue, in a cursory fashion, that Mr. Vekaria has not sufficiently pled his claims under FRCP 9(b).  (Mem. of Law in Supp. at 19-20.)  Movants argue that Plaintiff has failed this standard by (1) grouping in Mr. Chapman with the other "MThree Defendants" (comprising the other individual Defendants herein); (2) not stating the physical location where the statements were made; (3) not alleging the date when the statements were made.  *Id.* at 20. Simply put, this information is not required to state a securities claim given the abundance of factual detail alleged throughout the FAC, and addressed above.

Mr. Vekaria alleged that, together, the MThree Defendants, among whom was named Mr. Chapman, engaged in a protracted scheme to induce him to accept employment for stocks that they did not intend to issue and recoup the full amount their own benefit upon MThree's sale. FAC at ¶ 73-77.  Mr. Vekaria assumed, as most people do, that people's intentions are in line with their words, but Mr. Vekaria could not plead the required state of mind until he realized the false intentions of these persons, when they refused to pay out his stocks without any explanation other than that they did not want to.  FAC at ¶ 43.  This was confirmed, even by Wiley's Vice President, who advised that Mr. Vekaria should seek redress from these persons for fraud.  *Id.* Movants argue that there could be competing inferences drawn from these allegations (Mem. of Law in Supp. at ¶ 19) but fail to draw any such inferences in their papers.  The motion should be denied.

E.  <u>ECI and Mr. Chapman Move to Dismiss the Tortious Interference Claim on the Basis that They Made Money off Their Interference, but this Proves Their Liability</u>

Movants argue that Plaintiff's claim for Tortious Interference with a Contract cannot survive because Movants only interfered because they wanted Mr. Vekaria's stocks without paying for them, which they argue is a justifiable business decision.  They argue that this is a defense, when in fact it is a judicial admission of liability.  (Mem. of Law in Supp. at 20-21.)  In

the context of tortious interference claims, the Second Circuit has routinely refused to dismiss claims at the pleading stage, as economic interest is more appropriately pled as an affirmative defense. *See Barnet v. Drawbridge Special Opportunities Fund LP*, 2014 WL4393320 (S.D.N.Y. 2014).  In Barnet, the Court held "the so-called 'economic interest' defense is an affirmative defense that is not properly addressed on a motion to dismiss." *Barnet*, 2014 WL4393320 at *23; *and see id.* ("[s]everal courts in the Second Circuit have refused to apply the economic interest defense at the pleading stage to dismiss complaints for tortious interference with contract, explaining that the facts of the pleadings were not sufficiently developed to show entitlement to the defense") (citation omitted).

Movants cite *Savage v. Galaxy Media & Mktg Corp.*, 2012 WL 2681423 (S.D.N.Y. 2012) and *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998) in support that a defense of economic interest can support a 12(b)(6) motion, but this is inaccurate.  In *Pani*, the complainant's claim was dismissed because he had not made out a prima facie case, not because of an economic interest defense, as Movants misconstrue. *See Pani,* 152 F.3d at 70-71.  *Savage* is an unreported case that applied the economic interest defense at the pleadings stage only where the movant's defense was itself contained in the complainant's pleadings. *Savage*, 2012 WL 2681423 at *10.  This case is inapplicable to the scenario at bar because the movant in *Savage* had a legitimate economic interest that it was protecting, because it was a debtor of the contractor as well as a shareholder that was looking to promote that business's performance. *See id.* This is inapposite here where Plaintiff alleges (1) Movants interfered for their personal, not business interests, and (2) was done with malice, as even now is being disclosed in the other parties' papers in support of their respective motions to dismiss.

Indeed, Movants misunderstand and misconstrue what the economic interest defense is, and what it protects. This defense does not protect illegal or malicious conduct, but rather is a judicial recognition that businesses generally pursue their own ends to the detriment of others. *See discussion* at *Savage*, 2012 WL 2681423 at *8. Here, Movants converted, absconded, and interfered in Mr. Vekaria's contractual interest in MThree. Certainly, they benefitted from this monetarily, but that is not the entire test and does not absolve them of wrongdoing. The question is whether they did so *with justification* or not, and the argument that the Movants were justified because they wanted more money for their own shares in MThree which they received by negotiating a sale without paying Mr. Vekaria for his portion of the shares is not only not a legal justification, it is malicious. The economic interest defense does not lie when the complained-of conduct is related to taking someone else's legal or financial stake in a business. *See again id.* ("[a] defendant may assert in response to this claim the economic interest affirmative defense— 'that it acted to protect its own legal or financial stake in the breaching party's business'") (emphasis added).

Further, tortious interference is properly pled with or without an allegation of malice, as malice is only required to overcome the economic interest defense, whereas here, as above, such a defense does not lie. Nevertheless, Wiley and MThree have alleged (in improper evidentiary form), that the MThree Defendants (including Mr. Chapman) warranted in their "Acquisition Agreement" (not in Plaintiff's possession), that they sold MThree free of any other security interest and that they were the sole owners. *See* Dkt. No. 66 at p. 3. In light of this disclosure, the aforementioned malice has been clearly shown, and will only be further supported in discovery. The Court should not dismiss this claim at this early stage.

F.  <u>Movants Fail to Establish that the Claim for Declaratory Judgment Pleaded Against
Them Can Be Satisfied by Plaintiff's Breach of Contract Claim as Against MThree</u>

Movants argue that the claim for Declaratory Judgment with consequential relief of
rescission of the merger and other ancillary purchase agreements between relevant parties should
be dismissed because money damages for breach of contract adequately protects him.  (Mem. of
Law in Supp. at 22-23.)  This analysis is flawed in numerous respects.

First, money damages cannot make Plaintiff whole.  The remedy for breach of contract is,
axiomatically, the benefit of the bargain.  Thus, Plaintiff's remedies as against MThree are
distinctly different than those against the Movants under this claim, as they encompasses (1) the
funds in their possession that more properly belong to Mr. Vekaria, which should be returned as
a matter of unjust enrichment, and (2) reaches other persons not subject to the breach of contract
claim as against MThree and who otherwise dispute that Mr. Vekaria has any such interest.

Plaintiff does not have an adequate remedy at law because he is not attempting to rescind
his contract with MThree but rather unwind all the subsequent deals that were unlawfully
transacted without his authorization, such as the merger and other acquisition agreements
between the various parties that purported to sell his shares in MThree.  Simply put, Plaintiff
does not have standing to sue for breach of contract (at law) under these agreements, as Movants
acknowledge ("[t]hose claims cannot serve as justification for recission of a wholly separate
agreement between MThree and Wiley") (*id.* at 22).  Thus, this claim is necessary to effect
complete justice between all parties and is brought as a matter of equity to establish his claims as
against the non-contracting parties—here the Movants.

Finally, the argument is primarily aimed at the relief of declaratory judgment, and not the
declaration itself.  Thus, these arguments are more properly dealt with at trial or summary
judgment, as they do not address a defense to the merits of the claim itself, only damages.

## <u>CONCLUSION</u>

In essence, ECI and Mr. Chapman argue that Plaintiff's allegations do not plead claims as against them for their misrepresentations about Mr. Vekaria's stock interests in MThree.  The Court should not allow, as a matter of public policy, these upper-level executives to entice top talent from other businesses on promises of significant equity, only to pull the rug out from under the new hire, close shop, and reap all the benefits personally.  The motion should be denied in its entirety.

Plaintiff has also alleged sufficient facts without any document discovery to survive early dismissal of his claims.  Should the Court deny the motion, disclosure will almost certainly lead to the discovery of numerous additional supporting facts, such as when the Movants first knew that they were going to sell MThree, whether other employees were also defrauded of their stock interests in MThree as a matter of course, and what exact representations they made to Wiley with regard to employee-shareholders.

However, should the Court find that any claim is liable to dismissal, Plaintiff respectfully requests that the Court permit Plaintiff to file a Second Amended Complaint, as the First Amended Complaint was merely changed to change ECI Partners "LLC" to ECI Partners "LLP."

DATED: March 30, 2023                    Respectfully submitted,

                                         Capell Barnett Matalon & Schoenfeld LLP

                         By:             _____
                                         Michelangelo Macchiarella (MM 3688)
                                         Travis Tatko (TT 7349)
                                         1385 Broadway, 12th Fl.
                                         New York, NY 10018
                                         Telephone: (212) 661-1144
                                         Email: TTatko@CBMSLaw.com

25