UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                          :

JITENDRA VEKARIA,                     :

               Plaintiff,       :

                                       :         22 Civ. 3197 (JPC)

     -v-                  :

                                       :         <u>OPINION AND ORDER</u>

MTHREE CORPORATE CONSULTING, LTD.,  :
JOHN WILEY & SONS, INC.,       :
ECI PARTNERS LLP, ALEX HEADLEY,  :
BENJAMIN TOWN, THOMAS SEYMOUR, and :
RICHARD CHAPMAN,         :

               Defendants.    :

---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      In this civil action, Jitendra Vekaria claims that Mthree Corporate Consulting Ltd. ("Mthree") wooed him away from his prior job with promises of equity-based compensation but then failed to pay him out for the value of his stake when Mthree later was bought out by John Wiley & Sons, Inc. ("Wiley"). Vekaria brings this suit against Mthree, Wiley, and a host of others who he says were involved in his hiring and the subsequent denial of his equity. Vekaria asserts a federal claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. He also pleads state law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unpaid wages and unlawful wage deductions under the New York Labor Law ("NYLL"), fraudulent inducement, negligent misrepresentation, tortious interference, conversion, and recission.

On September 30, 2023, the Court dismissed Vekaria's First Amended Complaint, Dkt. 63 ("FAC").  *See Vekaria v. Mthree Corp. Consulting, Ltd.* ("*Vekaria I*"), No. 22 Civ. 3197 (JPC), 2023 WL 6387275 (S.D.N.Y. Sept. 30, 2023).  The Court dismissed Vekaria's securities fraud count for failure to state a claim for relief and, after concluding that the First Amended Complaint did not adequately allege complete diversity of citizenship, declined to exercise supplemental jurisdiction over his remaining state law claims.  *See id.* at *5-10.  The Court, however, *sua sponte* granted Vekaria leave to amend, *id.* at *9-10, and on October 30, 2023, he filed the operative Second Amended Complaint, Dkt. 85 ("SAC").

Mthree, Wiley, ECI Partners LLP ("ECI"), Richard Chapman, and Thomas Seymour (collectively, the "Moving Defendants") now move to partially dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief.  For the following reasons, the Court grants the Moving Defendants' motions in full and dismisses Counts Three through Ten as to those Defendants.  Because the grounds justifying dismissal of those Counts as to the Moving Defendants appear to apply equally to the two non-moving Defendants, Alex Headley and Benjamin Town, the Court also puts Vekaria on notice of its intent to *sua sponte* dismiss his claims against those individuals as well.  The Court will afford Vekaria the opportunity to show cause why dismissal as to Headley and Town also is not appropriate.

# I. Background

## A.    Facts[1]

Vekaria, a citizen of Massachusetts, worked for J.P. Morgan in 2018.  SAC ¶¶ 11, 28.  That same year, while still at J.P. Morgan, he took part in "extensive pre-employment discussions and negotiations" ahead of his contemplated move to a different company, Mthree.  *Id.* ¶ 28.  As described by Wiley in its Form 10-Q[2] filed with the SEC on March 6, 2020, Mthree was a "rapidly growing education services provider" that locates, trains, and places "job-ready technology talent in roles with leading corporations worldwide."  John Wiley & Sons, Quarterly Report (Form 10-Q), at 13 (Mar. 6, 2020), available at https://investors.wiley.com/financials/sec-filings/default.aspx (last visited Sept. 27, 2024).  As a Delaware corporation with its principal place of business in New Jersey, SAC ¶ 12, Mthree is a citizen of those two states.  *See Prime Prop. & Cas. Ins. Inc. v. Elantra Logistics LLC*, No. 20 Civ. 5737 (JPC), 2021 WL 4066737, at * 2 (S.D.N.Y. Sept. 7, 2021) ("Corporations are citizens of the states in which they are incorporated and maintain their principal places of business." (citing 28 U.S.C. § 1332(c)).

Those employment negotiations, which "stretched over several months," entailed discussions between Vekaria and several others involved with Mthree.  SAC ¶¶ 28-29.  Headley, a citizen of the United Kingdom, served as Mthree's Chief Executive Officer ("CEO") during these talks.  *Id.* ¶ 15.  Town, also a citizen of the United Kingdom, was one of Mthree's founding partners

---

[1] The following facts, which are assumed true solely for purposes of this Opinion and Order, are taken from the Second Amended Complaint.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").

[2] Form 10-Q is a comprehensive financial report that public companies must file with the SEC at the end of each of the first three quarters of the fiscal year.  *See* 15 U.S.C. § 78m; 17 C.F.R. § 249.308a.

and occupied the role of Global Sales Director. *Id.* ¶ 16. Seymour and Chapman, again citizens of the United Kingdom, were also involved. *Id.* ¶¶ 17-18. Seymour served as Mthree's Director of Human Resources, *id.* ¶ 17, while Chapman was a partner of ECI and served on Mthree's board of directors, *id.* ¶ 18. ECI was Mthree's majority shareholder at the time and, based on its membership, is a citizen of the United Kingdom. *Id.* ¶¶ 2, 14. Headley, Town, Seymour, and Chapman (collectively, the "Individual Defendants") likewise held an equity stake or comparable financial interest in Mthree, or otherwise stood to gain financially from an acquisition of the company. *Id.* ¶ 34.

During his pre-employment discussions with the Individual Defendants, Vekaria made clear that because he stood to "lose a very substantial amount of equity-based compensation" if he left his current position at J.P. Morgan, he would not join Mthree unless he received a "meaningful equity position" in the company. *Id.* ¶ 29. Accordingly, on January 2, 2019, Headley sent Vekaria an email confirming that he would receive Mthree stock "vesting immediately and fully paid by Mthree upon [] Vekaria's hiring," and directed Seymour to prepare an employment agreement reflecting those terms. *Id.* ¶ 30. Then, on January 3, 2019, Headley sent Vekaria another email confirming that Vekaria would receive a "1% equity position in Mthree" without any cost to Vekaria himself. *Id.*

In the time leading up to Vekaria's departure from J.P. Morgan, Headley also "discussed MThree's plans and intentions either to refinance or sell MThree at a substantial profit to ECI and other MThree shareholders (including Mr. Vekaria if he were to become an employee at MThree) in the coming years." *Id.* ¶ 32. Headley represented that Mthree was then valued at £30 million, and that "MThree's management was targeting a refinance or sale transaction within the next couple years based on a valuation of £100 million." *Id.* In the event such a transaction were

4

consummated, Headley went on, "the entirety of Mr. Vekaria's MThree Stock would be fully vested and cashed out." *Id.* But apart from these oral statements, Vekaria was never provided with "any written information or other material information related to the value of MThree or the MThree Stock," such as a price placement memorandum, financial information, or other disclosure documents related to the value of Mthree's stock. *Id.*

On January 7, 2019, following months of negotiations, Vekaria left J.P. Morgan and joined Mthree as a salesperson in the company's sales department for the North American region. *Id.* ¶ 22. Around that same day, Vekaria and Mthree signed an "Employment Agreement," which Seymour executed on behalf of the company. *Id.* ¶ 23. Under the terms of the Employment Agreement, Mthree agreed to provide Mr. Vekaria "an immediate, fully vested stock issuance comprising 1% of the fully diluted capital stock of Mthree." *Id.* ¶ 24. The Employment Agreement further required Mthree to provide Vekaria "an additional 2% of the fully diluted capital stock of Mthree," which Mthree agreed to issue to Vekaria "immediately upon an acquisition of MThree, or otherwise in 1% increments upon the first and second anniversaries of Mr. Vekaria's employment." *Id.* ¶ 25. Headley, Town, Seymour, and Chapman all "approved the terms of the Employment Agreement" on behalf of Mthree. *Id.* ¶ 31.

On January 1, 2020, Wiley, a New York corporation with a principal place of business in New Jersey, acquired Mthree. *Id.* ¶¶ 13, 33. In a press release announcing the transaction, Wiley disclosed that it had acquired Mthree from ECI and that, "[u]nder the terms of the agreement, mthree shareholders received approximately $129 million (£98 million) in cash at [the] January 1 closing." *Id.* ¶ 36 (quoting press release). Wiley further disclosed in its Form 10-Q quarterly report, filed with the SEC on March 6, 2020, that it had "completed the acquisition of 100% of the outstanding stock of mthree" and that "[t]he preliminary fair value of the consideration transferred

at the acquisition date was $128.6 million." *Id.* ¶ 37 (quoting Form 10-Q).  Based on the $128.6 million purchase price, Vekaria claims that his 3% ownership interest would have been "valued at approximately $3,858,000." *Id.* ¶ 38; *see also id.* ¶ 32 (alleging that during the pre-employment negotiations, Headley told Vekaria that upon an acquisition "the entirety of Mr. Vekaria's MThree Stock would be fully vested and cashed out resulting in transaction proceeds payable to Mr. Vekaria in the amount of approximately $3.25 million based on his 3% equity position in Mthree").

Nevertheless, Vekaria did not receive "any compensation whatsoever" from the transaction. *Id.* ¶ 43.  ECI, on the other hand, "touted that [] it substantially profited" from the acquisition, boasting a "2.7x" return on its investment in Mthree. *Id.* ¶ 40.  Headley, Town, Seymour, and Chapman also received compensation in connection with the Wiley transaction on account of their Mthree equity. *Id.* ¶ 41.  Vekaria did, however, receive a "transaction bonus," which Mthree awarded to him and many other employees of the company "regardless of whether or not they held stock ownership in Mthree." *Id.* ¶ 42.  Indeed, a letter that Vekaria received from Mthree in connection with his "transaction bonus . . . said nothing at all about Mr. Vekaria's stock in MThree, nor [made] any mention at all that the transaction bonus was somehow related to or consideration for Mr. Vekaria's MThree Stock." *Id.*  And Vekaria never agreed "to sell or transfer his equity in MThree to Wiley . . . , nor did Mr. Vekaria sign any documents to any such effect." *Id.* ¶ 44.

In April 2020, Vekaria left Mthree following approximately one year and three months of continuous employment at the company. *Id.* ¶ 45.  The following year, Vekaria "sought to clarify the status of his MThree Stock with MThree and Wiley as well as certain tax issues resulting from the transaction." *Id.* ¶ 46.  But over the course of those discussions, which had been "escalated to senior members of MThree's and Wiley's management team[] and included Mr. Town and Mr.

Seymour," Mthree and Wiley took the position that Vekaria was neither a shareholder of Mthree nor entitled to any compensation on account of his promised equity in Mthree. *Id.* ¶¶ 46-47.

According to Vekaria, the denial of his equity was "a contrivance in order to avoid known liabilities." *Id.* ¶ 48. "Mr. Chapman directed that Mr. Vekaria and other MThree employees holding stock or stock rights in MThree would not be treated as MThree shareholders or paid for their stock interest" in connection with the Wiley transaction "because this would result in unfavorable tax consequences." *Id.* Specifically, through telephone conversations and emails with the other Defendants, "Mr. Chapman stated that MThree was not to recognize or pay Mr. Vekaria or other MThree stockholders" in connection with the Wiley transaction. *Id.* As a result, Mthree, ECI, Wiley, Town, and Seymour were each "aware that Mr. Chapman directed that Mr. Vekaria and other MThree stockholders [were] not to be paid for their stock." *Id.*

To date, Vekaria "has not received a single stock certificate or any compensation whatsoever on account of his MThree Stock," nor has he "transferred any of his stock in MThree at any time." *Id.* ¶¶ 49-50.

**B.    Procedural History**

The Court set forth the procedural history of this case leading to the First Amended Complaint in its September 30, 2023 Opinion and Order, *see Vekaria I*, 2023 WL 6387275, at *3-4, and so the Court limits herein its procedural history discussion.

After having received leave to do so, Dkt. 59, Vekaria filed the First Amended Complaint on January 18, 2023. Dkt. 63. The First Amended Complaint invoked this Court's diversity and federal question jurisdiction (along with supplemental jurisdiction), FAC ¶¶ 19-20, bringing nine claims under state law and one under federal law. Against only Mthree, Vekaria asserted a breach of contract claim (Count One) and a claim for breach of the implied covenant of good faith and

fair dealing (Count Two).  *Id.* ¶¶ 47-57.  Against Mthree and the Individual Defendants, he brought claims for fraudulent inducement (Count Five) and negligent misrepresentation (Count Six), *id.* ¶¶ 72-85, and further alleged violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Count Seven), *id.* ¶¶ 86-94—the only claim arising under federal law.  Against all Defendants, he asserted claims for unpaid wages (Count Three) and unlawful wage deductions (Count Four) under the NYLL, *id.* ¶¶ 58-71, as well as a claim for conversion (Count Nine), *id.* ¶¶ 103-107.  Against Wiley, ECI, and the Individual Defendants, Vekaria further alleged interference with contractual relations (Count Eight).  *Id.* ¶¶ 95-102.  Finally, Vekaria sought a declaratory judgment under Section 3001 of the New York Civil Practice Law and Rules affirming his ownership interest in the Mthree stock and ordering the rescission of any transactions associated with it (Count Ten).  *Id.* ¶¶ 108-110.

On September 30, 2023, the Court granted the Moving Defendants' partial motions to dismiss the First Amended Complaint and *sua sponte* dismissed that Complaint as to the two non-moving defendants, Headley and Town.  *See Vekaria I*, 2023 WL 6387275, at *1.  As to Vekaria's lone cause of action under federal law, his Exchange Act claim, the Court held that the First Amended Complaint failed to plausibly allege that Defendants' purported misstatements regarding Vekaria's equity were made "in connection with" the purchase or sale of a security, as required under Section 10(b) and Rule 10b-5.  *Id.* at *6-9.  Specifically, the Court explained that the "gravamen of Vekaria's securities claim is that the [Mthree and the Individual Defendants] have fraudulently refused to issue the Mthree Stock to him" and that the First Amended Complaint lacked allegations "that [Mthree and the Individual Defendants'] conduct misrepresented or affected the value of the company's stock or otherwise concerned the characteristics or attributes that would induce an investor to buy or sell that stock."  *Id.* at *8.  Regarding Vekaria's attempt to

invoke the Court's diversity jurisdiction as to his remaining state law claims, the Court held that the First Amended Complaint failed to adequately plead complete diversity of citizenship because its allegations concerned only the Individual Defendants' places of residency and failed to plead facts sufficient to show Wiley, Mthree, and ECI's citizenships as well. *Id.* at *5 (holding that the First Amended Complaint's "allegations fall short of pleading that each Defendant has citizenship that is diverse as to Vekaria"); *see, e.g.*, *Canedy v. Liberty Mut. Ins. Co.*, 126 F.3d 100, 103 (2d Cir. 1997) (noting that "it is well-established that allegations of residency alone cannot establish citizenship" (citation omitted)). And without a plausibly alleged federal cause of action, the Court declined to exercise supplemental jurisdiction over Vekaria's state law claims. *Vekaria I*, 2023 WL 6387275, at *9. But the Court *sua sponte* granted Vekaria leave to further amend his complaint, *id.* at *9-10, and he did so on October 30, 2023, by filing the Second Amended Complaint, which repleads the same ten causes of actions alleged in the First Amended Complaint against the same sets of Defendants, Dkt. 85.

On December 15, 2023, Wiley and Mthree moved jointly under Federal Rule of Civil Procedure 12(b)(6) to dismiss the NYLL claims (Counts Three and Four), the fraudulent inducement claim (Count Five), the negligent misrepresentation claim (Count Six), the Exchange Act claim (Count Seven), the interference with contractual relations claim (Count Eight), the conversion claim (Count Nine), and the claim for a declaratory judgment (Count Ten). Dkts. 92, 93 ("Wiley & Mthree Br."). ECI and Chapman also moved jointly under Rule 12(b)(6) to dismiss each of those claims. Dkts. 97, 98 ("ECI & Chapman Br."). ECI and Chapman further pointed out that while they were not disputing subject matter jurisdiction, the Second Amended Complaint again failed to adequately allege complete diversity of citizenship because it did not positively identify the citizenships of each of ECI's members. *See* ECI & Chapman Br. at 5-6 n.3. Finally,

Seymour moved under Rule 12(b)(2) to dismiss the action as against him for lack of personal jurisdiction, and alternatively under Rule 12(b)(6) to dismiss the NYLL claims (Counts Three and Four), the Exchange Act claim (Count Seven), the fraudulent inducement claim (Count Five), the negligent misrepresentation claim (Count Six), the tortious interference claim (Count Eight), and the conversion claim (Count Nine).  Dkt. 94, 95 ("Seymour Br."), 96.

On January 31, 2024, Vekaria filed his opposition to each of these motions.  Dkts. 99 ("Vekaria Opp. to Wiley & Mthree Br."), 100 ("Vekaria Opp. to Seymour Br."), 101 ("Vekaria Opp. to ECI & Chapman Br.").  And on April 28, 2023, the Moving Defendants filed their respective replies.  Dkts. 102 (ECI and Chapman), 103 (Wiley and Mthree), 104 (Seymour).

Although ECI conceded subject matter jurisdiction in its motion to dismiss, on August 23, 2024, the Court ordered Vekaria to show cause why the Court could properly exercise diversity jurisdiction over his state law claims given the Second Amended Complaint's failure to allege the citizenships of each of ECI's members.  Dkt. 112; *see Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."); *Roche Cyrulnik Freedman LLP v. Cyrulnik*, 582 F. Supp. 3d 180, 187 (S.D.N.Y. 2022) ("For an LLP, citizenship depends on the citizenship of its partners: an LLP is treated as a citizen of every state of which its partners are citizens.").  In response, ECI filed a statement pursuant to Federal Rule of Civil Procedure 7.1 identifying each of ECI's members at the time this litigation was commenced and specifying their respective citizenships.  Dkt. 113.  Vekaria then followed up with a declaration that also identified ECI's members, Dkt. 115, as well as a memorandum of law in support of his assertion of diversity

jurisdiction, Dkt. 116. These submissions suffice to establish the Court's diversity jurisdiction at this stage in the litigation. *See* 28 U.S.C. § 1332(a).

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, the Rule 12(b)(6) plausibility standard requires factual allegations sufficient to "'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged." *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556).

These factual allegations, however "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Indeed, the plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it "need not consider conclusory allegations or legal conclusions couched as factual allegations," *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted). As a result, a complaint must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

A plaintiff bringing securities fraud claims must also satisfy heightened pleading standards under Federal Rule of Civil Procedure 9(b) to survive a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Specifically, a plaintiff's fraud allegations under Section 10(b) and Rule 10b-5 "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Diesenhouse v. Soc. Learning & Payments, Inc.*, No. 20 Civ. 7436 (LJL), 2022 WL 3100562, at *4 (S.D.N.Y. Aug. 3, 2022) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Allegations that are conclusory or unsupported by factual assertions are insufficient. *See ATSI Commc'ns*, 493 F.3d at 99; *see also Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

### III.  Discussion

The Moving Defendants seek dismissal for failure to state a claim of Vekaria's claims for unpaid wages and unlawful wage deductions (Counts Three and Four), fraudulent inducement and negligent misrepresentation (Counts Five and Six), securities fraud under Section 10(b) of Exchange Act and SEC Rule 10b-5 (Count Seven), interference with contractual relations (Count Eight), conversion (Count Nine), and a declaratory judgment and order of recission (Count Ten). The Court addresses each of those claims in turn.

### A.    Counts Three and Four – Unpaid Wages and Unlawful Wage Deductions

Vekaria asserts claims against all Defendants under the NYLL for unpaid wages and unlawful deductions from his wages based on their failure to honor his promised equity in Mthree. SAC ¶¶ 62-75 (Counts Three and Four). Wiley and Mthree move to dismiss these claims on the ground that, as equity-based compensation in the nature of a "sign-on bonus," the stock Vekaria was promised does not satisfy the statutory definition of "wages." Wiley & Mthree Br. at 5-7.

The remaining Moving Defendants echo that argument and add that Vekaria's NYLL claims independently fail as against ECI and the Individual Defendants because none of those parties were Vekaria's employer. ECI & Chapman Br. 14-18; Seymour Br. 5-7. Because the Court agrees that the equity Vekaria was allegedly promised does not satisfy the NYLL's definition of "wages" as a matter of law, it is not necessary to consider whether ECI and the Individual Defendants were Vekaria's employers.

Article Six of the NYLL protects employees against the unlawful nonpayment of wages or an employer's improper deductions from the same. *See* N.Y. Lab. Law § 190 *et seq*.; *see, e.g.*, *id.* § 193(1) (providing that, except in situations not relevant here, "[n]o employer shall make any deduction from the wages of an employee"). For purposes of those protections, the NYLL defines "wages" as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 516 (2d Cir. 2022) (quoting N.Y. Lab. Law § 190(1)). Because the statute defines wages as compensation "for labor or services rendered," the New York Court of Appeals has held that payments to employees that hinge on the "employer's overall financial success" and not on the employee's "own personal productivity" are not considered wages. *Truelove v. Ne. Cap. & Advisory, Inc.*, 95 N.Y.2d 220, 224 (2000). Under this standard, bonuses offered as a means to attract or retain employees generally do not constitute wages, because such incentive payments do not typically depend on the employee's personal productivity. *See Beach v. HSBC Bank USA, N.A.*, No. 17 Civ. 5153 (WHP), 2017 WL 5633162, at *3 (S.D.N.Y. Nov. 20, 2017) (explaining that compensation "predicated on [the employer's] efforts to induce, recruit, and retain" talent does not constitute wages under § 190(1)); *see also Int'l Bus. Machs. Corp. v. Martson*, 37 F. Supp. 2d 613, 617 (S.D.N.Y. 1999) ("It has long been held that stock award

plans . . . whose objectives are to retain talented executives by providing them with a proprietary interest in the growth and performance of the company, are not 'wages' under § 190 of the New York Labor Law.").  Likewise, equity-based compensation is usually found not to meet the definition of wages when, as a stake in the employer's enterprise, the value of such compensation depends on the employer's financial success rather than the employee's productivity.  *See, e.g.*, *Guiry v. Goldman, Sachs & Co.*, 814 N.Y.S.2d 617, 619-20 (1st Dep't 2006) (finding that equity-based compensation did not constitute wages because "its ultimate value to the employee was dependent, at least in part, on the financial success of the business enterprise" (internal quotation marks omitted)).

Under these principles, the Mthree stock Vekaria was allegedly promised fails to meet the definition of "wages" for purposes of the NYLL.  The Second Amended Complaint alleges at length that Vekaria was promised an equity position in Mthree as an inducement to join the company and as an incentive to remain with it.  *See, e.g.*, SAC ¶ 2 ("The MThree Stock was a fundamental and material inducement to Mr. Vekaria's agreement to join MThree . . . ."); *id.* ¶ 78 ("[Mthree and the Individual Defendants], for the purposes of inducing Mr. Vekaria to join MThree as an employee and retain Mr. Vekaria's employment after his hiring, made material misrepresentations of facts, including representing that Mr. Vekaria was an equity holder in MThree and owned the MThree Stock upon his hiring."); *id.* ¶ 80 ("[Mthree and the Individual Defendants] purposely made these representations to induce reliance by Mr. Vekaria to join MThree as an employee and continue his employment with MThree."); *id.* ¶ 87 ("[Mthree and the Individual Defendants] intended that Mr. Vekaria rely on their representations in order to solicit and retain Mr. Vekaria as an employee at MThree.").  In addition, the Second Amended Complaint alleges no facts indicating that Vekaria's promised equity in Mthree was in any way connected to

his personal job performance.  Indeed, Vekaria alleges that the Employment Agreement required Mthree to provide him a 1% equity stake immediately upon his joining the company, and that he would receive the remaining 2% upon an acquisition of the company or otherwise in equal parts on the first and second anniversaries of his employment regardless of his personal productivity. *See id.* ¶¶ 24-25.  Lastly, Vekaria's receipt of a fixed salary further suggests that his promised equity-based compensation did not constitute wages.  *See Martson*, 37 F. Supp. 2d at 618.

Instead, the allegations of the Second Amended Complaint reveal that Vekaria's equity-based compensation depended on Mthree's (the employer's) financial success.  Vekaria describes the equity-based compensation he is entitled to as 3% "of the fully diluted capital stock of Mthree." SAC ¶¶ 24-25, 31.  As an equity stake in Mthree, the ultimate value of the compensation therefore depended on the overall financial success of the company.  Indeed, the Second Amended Complaint alleges that "upon . . . a refinance or sale transaction, the entirety of Mr. Vekaria's MThree Stock would be fully vested and cashed out resulting in transaction proceeds payable to Mr. Vekaria in the amount of approximately $3.25 million based on his 3% equity position in MThree." *Id.* ¶ 32.  As a result, "the value of those shares could have substantially diminished or increased irrespective of [Vekaria's] own performance.  In fact, [Vekaria] could have performed poorly months before the [Mthree stock] vested and still would have received the shares as long as he remained employed." *Beach*, 2017 WL 5633162, at *2.  Because the Mthree equity's "ultimate value was dependent on the future market value of [Mthree's] stock," and not on Vekaria's job performance, it does not constitute "wages" under the NYLL.  *Lerner v. Credit Suisse Sec. (USA) LLC*, 147 N.Y.S.3d 31, 32 (1st Dep't 2021); *see Molnar v. Greentech Cap. Advisors, L.P.*, 176 N.Y.S.3d 245, 246 (1st Dep't 2022) ("The ultimate value of plaintiff's equity-based compensation was contingent on the company's future market value, and thus, was

dependent, at least in part, on the financial success of the business enterprise. As a result, the compensation that plaintiff seeks to recover is a form of incentive compensation in the nature of a profit-sharing arrangement."); *Overton v. Egami Grp., Inc.*, 156 N.Y.S.3d 734, 735 (1st Dep't 2022) ("Plaintiff's claim that defendants failed to grant her equity depends on defendants' overall financial success and thus lacks the direct relationship between [her] own performance and the compensation to which [she] is entitled contemplated by [NYLL] article 6." (internal quotation marks omitted)).

Vekaria relies on two cases in support of his position that his promised equity-based compensation constituted wages. First, in *Hallett v. Stuart Dean Co.*, the court held that a CEO's incentive payments constituted wages because, in addition to their nondiscretionary, vested nature, the payments depended in significant part on his personal job performance. 481 F. Supp. 3d 294, 310 (S.D.N.Y. 2020). Similarly, in *Ryan v. Kellogg Partners Institutional Services*, the employee had requested a total compensation package of $350,000 to leave his prior job, but agreed to allow the employer to "split" the first year's compensation into "a salary of $175,000 and a guaranteed bonus of $175,000." 968 N.E.2d 947, 949 (N.Y. 2012). The New York Court of Appeals found that the bonus portion of the employee's compensation constituted wages because "its payment was guaranteed and non-discretionary as a term and condition of his employment" and because the bonus "was expressly linked to his labor or services personally rendered; namely, his work as a floor broker." *Id.* at 956 (cleaned up).

Vekaria is right that his promised equity payments are like the bonuses at issue in *Hallett* and *Ryan* insofar as the Employment Agreement allegedly made such compensation nondiscretionary and expressly conditioned on him joining and remaining at Mthree as an employee. *See* SAC ¶¶ 24-25. But if those factors alone were enough to classify an employee's

compensation as wages, then nearly every sign-up or retention bonus included in an employment contract as a mandatory term would constitute wages. New York courts, however, have held that the mandatory nature of an employee's compensation is not by itself enough to bring it within the NYLL's definition of "wages." *See Guiry*, 814 N.Y.S.2d at 619 ("[E]ven if we assume (in plaintiff's favor) that [the employer] had no discretion in determining whether to award equity-based compensation to a given employee in a given year, the equity-based compensation still should not qualify as 'wages' . . . ."); *Lerner*, 147 N.Y.S.3d at 32 (explaining that under the circumstances, "[t]he fact that the employees' rights to [equity-based] compensation had already vested [was] irrelevant"). Indeed, sign-up and retention bonuses, which are used to incentivize talented employees to join and remain at a company without being tied to their personal productivity, have traditionally been excluded from the definition of wages. *See, e.g.*, *Beach*, 2017 WL 5633162, at *2-3; *Gilman v. Marsh & McLennan Cos.*, 868 F. Supp. 2d 118, 135-36 (S.D.N.Y. 2012). For similar reasons, compensation in the nature of profit-sharing arrangements has been excluded as well. *See, e.g.*, *Komlossy v. Faruqi & Faruqi, LLP*, No. 15 Civ. 9316 (KPF), 2017 WL 722033, at *13 (S.D.N.Y. Feb. 23, 2017). In other words, what matters just as much, if not more, than the discretionary or nondiscretionary nature of compensation is the purpose that the compensation serves and whether its value is more strongly connected to the employee's personal performance or to the employer's overall financial success. Thus, in *Hallett*, a critical feature of the bonus was that twenty-five percent of its value may have been directly related to the employee's performance while the remaining seventy-five percent, though tied to the company's performance as a whole, still "could be said to reflect [the employee's] performance" given the unique nature of his position as CEO. 481 F. Supp. 3d at 310. And in *Ryan*, the $150,000 bonus, though distinct from the employee's regular compensation, effectively functioned as a salary-

substitute and had no relationship to the employer's overall profitability. 968 N.E.2d at 949, 956; *see also Beach v. Touradji Cap. Mgmt., LP*, No. 603611/08, 2014 WL 840409, at *4 (N.Y. Sup. Ct. Feb. 26, 2014) (explaining that in *Ryan*, "[t]he bonus constituted wages because as a salary substitute it directly compensated the employee for his personal services" and because "[t]he amount of the guaranteed bonus was fixed regardless of the company's or some sub-set of the company's performance"). Here, by contrast, the Second Amended Complaint alleges that Vekaria's equity-based compensation functioned as a signup and retention bonus, that it was unrelated to his personal job performance or his regular salary, and that the ultimate value of the equity, as a stake in Mthree's business, depended more on the overall financial success of the company than on Vekaria's personal success as a salesperson. Under these circumstances, the nondiscretionary nature of the compensation is not enough to bring it within the NYLL's definition of "wages."

Accordingly, the Court grants the Moving Defendants' motions to dismiss as to Counts Three and Four.

**B.    Counts Five and Six – Fraudulent Inducement and Negligent Misrepresentation**

Vekaria also seeks to hold Mthree and the Individual Defendants liable for fraudulent inducement and negligent misrepresentation based on what he alleges were false promises to provide him with Mthree equity under the Employment Agreement. SAC ¶¶ 76-89 (Counts Five and Six). To plead a claim for fraudulent inducement, a plaintiff must allege: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Baker-Rhett v. Aspiro AB*, 324 F. Supp. 3d 407, 418-19 (S.D.N.Y. 2018) (quoting *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006)). And for negligent misrepresentation, "the plaintiff must allege that (1) the defendant had a duty, as a result of a

18

special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Wargo v. Hillshire Brands Co.*, 599 F. Supp. 3d 164, 175 (S.D.N.Y. 2022) (quoting *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012)).  Here, Mthree and the Individual Defendants challenge Vekaria's fraudulent inducement and negligent misrepresentation claims on the ground that they are duplicative of his breach of contract claim against Mthree.  *See, e.g.*, Wiley & Mthree Br. at 8-9; ECI & Chapman Br. at 11-12.  The Court agrees and dismisses these claims on that basis.

Under New York law, "[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Dormitory Auth. v. Samson Constr. Co.*, 94 N.E.3d 456, 460 (N.Y. 2018) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 439 F. Supp. 3d 275, 282 (S.D.N.Y. 2020) (explaining that when a "plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory" (citation omitted)).  Accordingly, "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (quoting *Sudul v. Computer Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994)); *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("As a general matter, a fraud claim may not

be used as a means of restating what is, in substance, a claim for breach of contract. Thus, general allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support a fraud claim." (cleaned up)). These principles apply just as forcefully to claims for negligent misrepresentation. *See Michael Davis Constr., Inc. v. 129 Parsonage Lane, LLC*, 149 N.Y.S.3d 118, 122 (2nd Dep't 2021) ("[A] negligent misrepresentation claim will be found to be duplicative of a breach of contract claim where the pleading fails to allege facts that would give rise to a duty that is independent from the parties' contractual obligations."). Accordingly, where a tort claim for misrepresentation appears to duplicate a breach of contract claim, courts have held that "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted).

Vekaria's Second Amended Complaint fails to invoke any of these exceptions. The alleged misrepresentations identified by the Second Amended Complaint are simply restatements of the terms of the Employment Agreement and, at most, constitute promises that Mthree would abide by the Employment Agreement. *See* SAC ¶¶ 24-25 (alleging the terms of the Employment Agreement); *id.* ¶ 31 (similar); *id.* ¶¶ 30, 32 (alleging that Headley confirmed that Vekaria would receive Mthree equity under the terms of the Employment Agreement and that the entirety of Vekaria's stock would be cashed out in the event of an acquisition); *id.* ¶¶ 78, 85 (identifying as false representations statements reflecting the terms of the Employment Agreement and Mthree's intent to honor the contract). Each of these alleged misstatements is a "quintessential example of a misrepresentation of an intent to perform under a contract." *Exch. Listing, LLC v. Inspira Techs.,*

*Ltd.*, 661 F. Supp. 3d 134, 157 (S.D.N.Y. 2023) (holding that a fraudulent inducement claim based on a promise to provide the plaintiff 75,000 shares was "entirely duplicative" of a corresponding breach of contract claim and explaining that whether the defendant "intended to perform or not under the [contract] is simply irrelevant"). As a result, Vekaria fails to demonstrate that any Defendant breached a legal duty separate from the contract or made any collateral or extraneous misrepresentations. Nor does Vekaria present any argument that the Second Amended Complaint adequately alleges special damages.[3] As a result, Vekaria's fraudulent inducement and negligent misrepresentation claims are duplicative of his breach of contract claim against Mthree.

Vekaria argues, however, that the Individual Defendants lack "standing" to raise a duplicativeness argument given the fact that none of them were parties to the Employment Agreement and are not themselves facing a claim for breach of contract. Vekaria Opp. to ECI & Chapman Br. at 15; Vekaria Opp. to Seymour Br. at 21. Indeed, the general rule is that a claim for misrepresentation "may be dismissed as duplicative only as against a defendant against whom the related contract claim is viable." *Sun Prod. Corp. v. Bruch*, 507 F. App'x 46, 48 (2d Cir. 2013) (quoting *Richbell Info. Servs. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 589 (1st Dep't 2003)) (emphasis removed). But even as against non-parties to a contract, "the alleged misrepresentation

---

[3] One portion of Vekaria's brief in opposition to ECI and Chapman's motion to dismiss is titled "The Misrepresentation Claims Are Collateral to the Contract, Particular, and Have Special Damages." Vekaria Opp. to ECI & Chapman Br. at 19. That section of the brief, however, advances no argument as to how the Second Amended Complaint alleges special damages. *See generally id.* at 19-22. To be sure, the Second Amended Complaint does suggest that by leaving J.P. Morgan, Vekaria missed out on compensation that he would have otherwise been entitled to. *See* SAC ¶¶ 29, 85. While those circumstances often give rise to special damages, *see Lankau v. Luxoft Holding, Inc.*, 266 F. Supp. 3d 666, 676-77 (S.D.N.Y. 2017), the Second Amended Complaint's vague allegations regarding the nature and amount of the compensation Vekaria supposedly lost by leaving J.P. Morgan are insufficient to plausibly allege special damages, let alone meet the stringent particularity standard for pleading special damages imposed under New York law and Federal Rule of Civil Procedure 9(g). *See JoySuds, LLC v. N.V. Labs, Inc.*, 668 F. Supp. 3d 240, 261 (S.D.N.Y. 2023).

must be distinct from merely representing *the party's* intent to perform under the contract." *Exch.*

*Listing*, 661 F. Supp. 3d at 158. Thus, "where the alleged misrepresentation is simply a

representation by a non-party that the party will in fact perform under the contract (*i.e.*, a

representation made on behalf of the contracting party), courts have found fraud claims to be

duplicative, even as against the non-party." *Id.*; *see, e.g., Khurana v. Wahed Inv., LLC*, No. 18

Civ. 233 (LAK) (BCM), 2020 WL 364794, at *12 (S.D.N.Y. Jan. 8, 2020) (rejecting as duplicative

a misrepresentation claim that "rest[ed] squarely on [an] allegation that [the company's CEO] had

no intent of actually causing [the company] to issue the promised equity"), *report and*

*recommendation adopted*, 2020 WL 364022 (S.D.N.Y. Jan. 22, 2020).

Here, too, all the alleged misrepresentations by the Individual Defendants are either simple

restatements of the terms of the Employment Agreement or affirmations of Mthree's intent to

comply with that contract. *See* SAC ¶¶ 30, 32, 78, 85. It is clear from the Second Amended

Complaint that these statements allegedly were "made in a purely representative capacity[] and

related solely to [Mthree's] obligations under the [Employment Agreement]." *Exch. Listing*, 661

F. Supp. 3d at 159. Dismissal of the fraudulent inducement and negligent misrepresentation claims

is therefore appropriate as against the Individuals Defendants as well, even though they were not

themselves parties to the Employment Agreement. *See id.*

Thus, the Court grants Mthree's, Chapman's, and Seymour's motions to dismiss as to

Counts Five and Six.

## C.    Count Seven – Securities Fraud

Vekaria realleges that Mthree and the Individual Defendants committed securities fraud in

connection with denying him equity in the company despite earlier promises to provide the same.

SAC ¶¶ 90-100. Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in

connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC has implemented Section 10(b) through Rule 10b-5, which, in relevant part, prohibits "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).[4] To state a claim for relief under the private cause of action implied by Section 10(b) and Rule 10b-5, the plaintiff "must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 105).

Despite the ubiquitous general title of this cause of action, securities fraud does not encompass any fraudulent transaction that happens to involve securities. *See Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984) (Friendly, J.) ("[I]t is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part."); *see also Sec. & Exch. Comm'n v. Zandford*, 535 U.S. 813, 820 (2002) (explaining that the Exchange Act "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)"); *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982) ("Congress, in enacting the securities laws, did not intend to provide a broad federal

---

[4] Vekaria's Second Amended Complaint only appears to allege claims under Subsection (b) of Rule 10b-5, 17 C.F.R. § 240.10b-5(b). *See* SAC ¶¶ 92-94.

remedy for all fraud.").  As this Court explained in *Vekaria I*, the in-connection-with requirement of Section 10(b) is therefore what distinguishes federal securities fraud from run-of-the-mill state law causes of action challenging material misrepresentations or alleging breach of contract.  2023 WL 6387275, at *6-7.

Consistent with these principles, the Second Circuit adheres to the rule that a securities fraud claim "fails where the plaintiff does 'not allege that [a defendant] misled him concerning the value of the securities he sold or the consideration he received in return.'"  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018) (quoting *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 108 (2d Cir. 1986)); *see also In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 967 (2d Cir. 1993) (explaining that the in-connection-with requirement is met "when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value").  The Supreme Court, for example, has held that selling a stock option while secretly intending to frustrate the buyer's ability to exercise it can give rise to a claim for securities fraud because whether and under what circumstances an option can be exercised is paramount to its value.  *See Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 596 (2001) ("Since [the defendant] did not intend to honor the option, the option was, unbeknownst to [the plaintiff], valueless.").  On the other hand, a securities fraud claim will not lie where the "fraudulent harm arises not from purchase of shares but from defendant's refusal to transfer promised shares." *Lawrence v. Cohn*, 325 F.3d 141, 154 (2d Cir. 2003); *accord Zandford*, 535 U.S. at 823 (distinguishing between a claim that the defendant merely "failed to carry out a promise to sell securities" and a claim that "the defendant sold a security while never intending to honor its agreement in the first place"); *see, e.g.*, *Lankau v. Luxoft Holding, Inc.*, 266 F. Supp. 3d 666, 679 (S.D.N.Y. 2017) (dismissing a securities fraud claim that was based on allegations that

"Defendants failed to provide the shares in accordance with the contested Employment Agreement"). The failure to abide by such promises is, instead, redressable through a claim for breach of contract or other state law cause of action, assuming that all the elements of those causes of action are met. Accordingly, to plead a connection between a misrepresentation and the purchase or sale of a security under this misrepresented-value approach, the plaintiff must identify misrepresentations that concern "the fundamental *nature*" of the securities he was promised; in other words, he must point to misstatements regarding "the characteristics and attributes that would induce an investor to buy or sell" the securities. *Kearney v. Prudential-Bache Sec. Inc.*, 701 F. Supp. 416, 424 (S.D.N.Y. 1988).

Here, Vekaria asserts that the in-connection-with requirement is satisfied because Defendants misled him regarding the value of his promised equity. *See* SAC ¶ 94 (pleading that the alleged misrepresentations concerned "the value of the [promised equity]"); Vekaria Opp. to Wiley & Mthree Br. at 12 ("Plaintiff's new allegations satisfy causation by . . . tying the misrepresentation to value."). As told by the Second Amended Complaint, the Employment Agreement provided that Defendants would give Vekaria a 1% equity stake in Mthree immediately upon his hiring, plus an additional 2% stake in the event that the company was acquired. *See* SAC ¶¶ 24-25. Echoing the terms of the Employment Agreement, Headley allegedly sent two emails to Vekaria stating that Vekaria would receive "a 1% equity position in MThree." *Id.* ¶ 30. Headley also supposedly told Vekaria that upon "a refinance or sale transaction, the entirety of Mr. Vekaria's MThree Stock would be fully vested and cashed out resulting in transaction proceeds payable to Mr. Vekaria in the amount of approximately $3.25 million based on his 3% equity position in Mthree." *Id.* ¶ 32. Mthree, however, failed to tender the promised shares to Vekaria, and as a result he was never paid for the value of his promised 3% stake when Wiley acquired the

company in January 2020. *See id.* ¶ 49 (alleging that Vekaria "has not received a single stock certificate or any compensation whatsoever on account of his [promised equity]"); *id.* ¶ 55 (characterizing Mthree's breach of the Employment Agreement as "refusing to issue the stock" Vekaria was promised).

Headley's alleged statements regarding the equity Vekaria would receive, however, merely summarized the terms of the Employment Agreement. Those statements may support the existence of a contractual promise by Mthree to deliver securities (or their equivalent cash value) to Vekaria, but they do not identify a misrepresentation regarding the underlying attributes of the securities that an investor might consider in assessing their value. The only statement that Vekaria identifies that relates to the value of the promised equity is Headley's representation that the company was pursuing a "refinance or sale transaction" and that upon the transaction's consummation Vekaria would be entitled to $3.25 million in transaction proceeds by virtue of the 3% stake he was promised. Am. Compl. ¶ 32. Vekaria, however, does not allege that the $3.25 million figure cited by Headley was false, but rather that he never received the promise shares and therefore was unable to benefit from the Wiley acquisition. The only statements alleged to have been false therefore related to promises that Vekaria would receive equity in the company, not to the value of that equity. In other words, as before, Vekaria "alleges not that Defendants failed to inform [him] of the truthful conditions of equity ownership once possessed, . . . but rather that Defendants failed to provide the shares in accordance with the contested Employment Agreement." *Lankau*, 266 F. Supp. 3d at 673 (dismissing a securities fraud claim that was based on allegations that the plaintiff "was repeatedly told, orally and in writing, that he would be awarded his equity compensation package" as part of an employment agreement).

26

Vekaria's continued reliance on *Dubin v. E.F. Hutton Group, Inc.*, 695 F. Supp. 138 (S.D.N.Y. 1988) remains unpersuasive.  There, a company promised its prospective employee that he would receive shares under the company's equity plan immediately upon joining, and that under the plan "his interest . . . would vest early, under any circumstances, in the event of a hostile takeover"—in other words, a "change of control."  *See id.* at 146-47.  But in reality, the company's equity plan afforded its board of directors the power "to determine that a change in ownership would not be considered a 'change of control' for purposes of the [equity plan]."  *Id.* at 141.  Because the company had told the prospective employee that his equity would automatically vest in the event of a hostile takeover when, in fact, its board of directors retained discretion to prevent such vesting, the misrepresentation directly implicated the value of the employee's equity.  *See id.* at 147 ("Like conditions which restrict the transferability of stock or restrict the exercise of . . . stock option rights, the conditions of the [equity plan] affecting vesting of stock or stock options substantially affected the value of the security to its holder.").  In other words, by virtue of the hidden board-approval requirement, the employee in *Dubin* received an interest of a lower value than what he was promised.

Here, by contrast, Vekaria does not allege that he received shares that, unbeknownst to him, were subject to a different set of rules than those he had been informed about, and were therefore of lesser value than what he was promised.  Instead, he alleges that Defendants misled him about their intent to deliver the shares to him as required by the terms of the Employment Agreement.  Thus, "[t]he fraud alleged had nothing to do with any particular security but related only to defendants' intention not to comply with the agreement."  *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 560-61 (2d Cir. 1985).  Because the injury Vekaria suffered was therefore caused by Defendants' alleged failure to transfer the promised securities or their

cash value, as opposed to his receipt of securities of a materially misrepresented value, his claim cannot satisfy the in-connection-with requirement under the misrepresented-value approach. *See Lawrence*, 325 F.3d at 154; *Lankau*, 266 F. Supp. 3d at 678.

Although the Second Amended Complaint fails to plead the in-connection-with requirement on a misrepresented-value theory, "neither the SEC nor [the Supreme Court] has ever held that there *must* be a misrepresentation about the value of a particular security" to state a claim for securities fraud. *Zandford*, 535 U.S. at 820 (emphasis added); *see also Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 594 (S.D.N.Y. 2005) (characterizing misrepresentations relating to the value of a security as a generally sufficient, but not necessary, condition for satisfying the in-connection-with requirement). As the Court explained in *Vekaria I*, "'misrepresentations [that] directly involve the consideration for a securities transaction' may also be actionable under Section 10(b)." 2023 WL 6387275, at *7 (quoting *Sec. & Exch. Comm'n v. Drysdale Sec. Corp.*, 785 F.2d 38, 41 (2d Cir. 1986)); *see also Pross v. Katz*, 784 F.2d 455, 457 (2d Cir. 1986) ("Making a specific promise to perform a particular act in the future while secretly intending not to perform may violate Section 10(b) . . . if the promise is part of the consideration for a sale of securities."). In *Zandford*, for instance, the Supreme Court deferred to the SEC's view that a defendant "who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b-5." 535 U.S. at 819; *cf. also Walling v. Beverly Enters.*, 476 F.2d 393, 396 (9th Cir. 1973) ("Entering into a contract [for the sale of securities] with the secret reservation not to fully perform it is fraud cognizable under § 10(b)." (citing *Commerce Reporting Co. v. Puretec, Inc.*, 290 F.Supp. 715 (S.D.N.Y. 1968))); *Threadgill v. Black*, 730 F.2d 810, 812 (D.C. Cir. 1984) (similar).

Vekaria, however, fails to plausibly allege that Mthree and the Individual Defendants secretly intended not to honor the Employment Agreement at the time they entered into it.  Under basic common law principles, "where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim."  *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016).  Because "a representation is fraudulent only if made with the contemporaneous intent to defraud," in other words, "the common law rejects any attempt to prove fraud based on inferences arising solely from the breach of a contractual promise."  *Id.*  Although these foundational principles originate in the common law, they inhere as well in Section 10(b) and Rule 10b-5's conception of securities fraud.  *See Sec. & Exch. Comm'n v. Jarkesy*, 144 S. Ct. 2117, 2130-31 (2024) (explaining that it is appropriate to "consider common law fraud principles when interpreting federal securities law" given "the close relationship between federal securities fraud and common law fraud"); *see also United States v. Hansen*, 599 U.S. 762, 778 (2023) ("When Congress transplants a common-law term, the old soil comes with it." (internal quotation marks omitted)).  At the pleadings stage, Vekaria was therefore required to present "[allegations]—other than the fact of breach—that, at the time [the] contractual promise was made, [Mthree and the Individual Defendants] had no intent ever to perform the obligation."  *O'Donnell*, 822 F.3d at 660.

This he has failed to do.  The Second Amended Complaint alleges that Mthree and the Individual Defendants made numerous promises, including in the terms of the Employment Agreement itself, that Vekaria would receive a 1% stake in Mthree immediately upon joining the company and be entitled to an additional 2% stake in the event Mthree was acquired.  SAC ¶¶ 23-25, 30-32.  Vekaria also alleges that during his pre-employment negotiations with Mthree, Headley

specifically promised that in the event Mthree was acquired, Vekaria's 3% stake "would be fully vested and cashed out resulting in transaction proceeds payable to Mr. Vekaria in the amount of approximately $3.25 million." *Id.* ¶ 32. Then, around the time of the Wiley acquisition a year later, Chapman allegedly "directed that Mr. Vekaria and other MThree employees holding stock or stock rights in MThree would not be treated as MThree shareholders or paid for their stock interest." *Id.* ¶ 48. As a result, Vekaria alleges that while he received a "transaction bonus" in connection with the Wiley acquisition, Mthree failed to deliver his equity or compensate him for its value as promised. *Id.* ¶¶ 42, 49. Missing from these allegations, however, is any indication, beyond the fact of the breach itself, that Mthree and the Individual Defendants entered into the Employment Agreement "with the contemporaneous intent to defraud." *O'Donnell*, 822 F.3d at 658. But a breach of contract—no matter how serious or intentional it may have been—cannot by itself plausibly support a claim for securities fraud. *See id.* at 660-61. Indeed, the Second Amended Complaint alleges that Mthree breached the Employment Agreement out of tax concerns related to the Wiley acquisition, SAC ¶¶ 48, 106, which undermines any inference that the failure to honor the Agreement was the result of a fraudulent scheme dating back to the execution of the contract.

In an effort to rescue his securities fraud claim, Vekaria also attempts to proceed under an omissions theory of liability. *See* Vekaria Opp. to Wiley & Mthree Br. at 12-13. According to the Second Amended Complaint, Defendants "failed to provide Mr. Vekaria with things such as a private placement memorandum ('PPM') or any other written disclosures or information related to the value of MThree Stock prior to his hiring." SAC ¶ 8. Based on this allegation, Vekaria argues that "Defendants misrepresented by omission the value of [his promised equity in Mthree] by . . . not including any substantiating documentation relating to [Mthree's] projected valuation

of £100 million." Vekaria Opp. to Wiley & Mthree Br. at 12. Because these documents presumably bore on Mthree's valuation at the time Vekaria entered into the Employment Agreement, and thus the value of the equity he was promised, Vekaria contends that Defendants' failure to provide the information constituted fraud by omission. *See id.* at 13.

This omissions argument fares no better than Vekaria's affirmative-misstatement theory. It is well-established that "§ 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information" in connection with a securities transaction. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (explaining that there is no requirement "to disclose a fact merely because a reasonable investor would very much like to know that fact"). Instead, "[t]he Supreme Court has instructed that 'silence, absent a duty to disclose, is not misleading under Rule 10b-5.'" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100-01 (2d Cir. 2015) (brackets omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)), *abrogated on other grounds by Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024). Absent a duty to disclose, and none is alleged here, an omission is actionable only when the concealed fact was "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Thus, a "failure to disclose information . . . can support a Rule 10b-5(b) claim only if the omission renders affirmative statements made misleading." *Macquarie Infrastructure Corp.*, 601 U.S. at 258; *see also Chiarella v. United States*, 445 U.S. 222, 234-35 (1980) ("Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud.").

Vekaria maintains that Defendants' claim that Mthree's projected valuation of £100 million was misleading because he was never provided any documentation to substantiate that estimate. Vekaria Opp. to Wiley & Mthree Br. at 12. But the Second Amended Complaint is devoid of any factual allegations indicating that the £100 million figure represented by Defendants was itself false, and Vekaria does not explain how the information contained in the "substantiating documents" Mthree supposedly withheld would have painted a different picture of the company's value. *Id.* Nor does the Second Amended Complaint allege that the valuation was misleading on any other ground. Indeed, as measured in U.S. dollars, the Second Amended Complaint alleges that Mthree was ultimately sold for *more* than the valuation Vekaria was promised, SAC ¶ 38,[5] so it is far from clear how Vekaria could make a showing of loss causation as to any representations relating to the valuation projection. This difficulty only underscores that, as alleged in the Second Amended Complaint, Vekaria's injury was not caused by any misrepresentations regarding the value of Mthree's securities or Defendants' intent to comply with the Employment Agreement, but at most by a simple breach of contract.

For these reasons, the Court grants Mthree's, Seymour's, and Chapman's motions to dismiss as to Count Seven.

**D.    Count Eight – Interference with Contractual Relations**

Vekaria also brings a claim for tortious interference with contractual relations against all Defendants other than Mthree itself, which was a party to the Employment Agreement. SAC ¶¶ 101-08. To plead a claim for tortious interference with a pre-existing contract under New York

---

[5] The Second Amended Complaint at times suggests that Wiley may have paid less than the claimed $128.6 million price for Mthree but offers no factual allegations in support of that contention and, in fact, appears to agree that $128.6 million was the correct price. *See* SAC ¶¶ 38-39.

law, a plaintiff must allege: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 343 (2d Cir. 2024) (internal quotation marks omitted).  Defendants assert various bases for dismissal of Vekaria's tortious interference claim, including failure to plead intentional interference, lack of causation, duplicativeness, and the economic-interest defense.  *See, e.g.*, Wiley & Mthree Br. at 18-21; ECI & Chapman Br. at 22-24.

As to Wiley, Headley, Town, and Seymour, the Court agrees that Vekaria's tortious interference claim fails because the Second Amended Complaint contains virtually no facts demonstrating how any of those parties caused Mthree's alleged breach of the Employment Agreement.  The Second Amended Complaint vaguely suggests that each of these parties was "involved with regard to the certification or liquidation of Mr. Vekaria's equity" and was "aware that Mr. Chapman directed that Mr. Vekaria . . . [was] not to be paid for [his] stock."  SAC ¶ 48. Vekaria also alleges, with no discernable factual support, that these parties "agreed with and participated in [Chapman's] conduct to interfere with and deny" Vekaria's equity.  *Id.* ¶ 106. Indeed, the only relevant factual allegations specific to these parties are that following the acquisition, Wiley "took the position that Mr. Vekaria was somehow not a stockholder" of Mthree and that Town and Seymour were employees of Mthree and involved in Vekaria's hiring, with Seymour having been the one to sign the Employment Agreement on behalf of Mthree.  *Id.* ¶¶ 9, 47-48.  But what these sparse allegations lack is any plausible indication as to what direct actions these parties took to interfere with the Employment Agreement and how any such interference was the but-for cause of Mthree's alleged breach. *See Four Finger Art Factory, Inc. v. Dinicola*, No.

33

99 Civ. 1259 (JGK), 2000 WL 145466, at *6 (S.D.N.Y. Feb. 9, 2000) (dismissing a tortious interference claim where the complaint contained "no specific allegations of actions taken by any specific defendant that caused the breach of the . . . contract"); *Manbro Energy Corp. v. Chatterjee Advisors, LLC*, No. 20 Civ. 3773 (LGS), 2021 WL 2037552, at *7 (S.D.N.Y. May 21, 2021) (dismissing a tortious interference claim based on similarly vague allegations); *see also Boehner v. Heise*, 734 F. Supp. 2d 389, 404 (S.D.N.Y. 2010) (explaining that to state a claim for tortious interference, "Plaintiffs must show Defendants' *direct interference* with a contract" (emphasis added)).

Vekaria's allegations of tortious interference against Chapman and ECI hit closer to the mark. The Second Amended Complaint alleges that Chapman, through "telephone conversations" and "email correspondence," directed Mthree not to provide Vekaria his equity or otherwise pay him out for the value of his shares in connection with the Wiley acquisition. SAC ¶¶ 48, 106. And, by alleging that Chapman served on Mthree's board of directors and was a partner of ECI, Mthree's controlling shareholder, the Second Amended Complaint supports a reasonable inference that Chapman had the ability to put his directive into practice. *See id.* ¶¶ 18, 34.

Chapman and ECI argue, however, that any claim for tortious interference against them is barred by the "economic interest doctrine." ECI & Chapman Br. at 22-24. That doctrine, which operates as an affirmative defense, provides that "[u]nless there is a showing of malice or illegality, a defendant's economic interest in the breaching party's affairs bars an action for tortious interference with contract." *Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*, 259 F. Supp.3d 16, 29-30 (S.D.N.Y. 2017); *see also Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996) ("[E]conomic interest is a defense to an action for tortious interference with a contract unless there is a showing of malice or illegality."). As a result, when the defendant has an economic interest

34

in the breaching party's business, the plaintiff must allege, in addition to the usual elements of tortious interference, that the defendant "either acted maliciously, fraudulently, or illegally" in causing the breach. *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 406 (S.D.N.Y. 2009). The economic-interest defense, in other words, "enable[s] a defendant to claim that it 'acted to protect its own legal or financial stake in the breaching party's business'" and thereby avoid liability for tortious interference. *Benihana of Tokyo*, 259 F. Supp. 3d at 30 (quoting *White Plains Coat & Apron Co. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007)). The economic-interest defense warrants dismissal at the pleading stage if the defendant's entitlement to the defense appears on the face of the complaint. *See Benihana of Tokyo*, 259 F. Supp. 3d at 30; *IMG Fragrance Brands*, 679 F. Supp. 2d at 406 n.5.

Here, the Second Amended Complaint establishes that both Chapman and ECI "possesse[d] an economic interest in [Mthree] sufficient . . . to defeat a claim for tortious interference with contract absent allegations of malice, fraud, or illegality." *Benihana of Tokyo*, 259 F. Supp. 3d at 30. The Second Amended Complaint alleges that ECI was Mthree's controlling shareholder and that Chapman, who served on Mthree's board of directors and was a partner of ECI, also had a personal financial stake in Mthree. *See* SAC ¶¶ 2, 34, 107. Vekaria further alleges that the reason Chapman and ECI directed Mthree to breach the Employment Agreement was to avoid "unfavorable tax consequences" and that as a result of the breach they "accrued additional value with regard to their individual stock interest." *Id.* ¶¶ 48, 107. These allegations are sufficient to permit Chapman and ECI to invoke the economic-interest defense because they demonstrate that both parties had a substantial financial interest in the management of Mthree's business and in the sale of the company to Wiley. *See White Plains Coat & Apron Co.*, 867 N.E.2d at 383 (explaining that the defense properly applies "where defendants were significant stockholders in

the breaching party's business"); *Kuhns v. Ledger*, 202 F. Supp. 3d 433, 442 (S.D.N.Y. 2016) (similar).

Vekaria argues that Chapman and ECI cannot benefit from the economic-interest defense for two reasons.  First, Vekaria asserts that Chapman and ECI "interfered for their personal, not business interests."  Vekaria Opp. to ECI & Chapman Br. at 23.  The Second Amended Complaint, however, alleges that Chapman directed Mthree to breach the contract to avoid "unfavorable tax consequences."  SAC ¶ 48.  Even if this allegation could be construed as referring to a personal interest of Chapman and ECI, as opposed to a business interest of Mthree, it is well-established that the defense is available both to defendants who act to protect their personal economic interests as well as those who seek to protect the breaching party's interests, as long as those interests relate directly to the breaching party's business.  *See Don King Prods., Inc. v. Smith*, 47 F. App'x 12, 15 (2d Cir. 2002) (citing *Felsen v. Sol Cafe Mfg. Corp.*, 249 N.E.2d 459 (N.Y. 1969)); *White Plains Coat & Apron Co.*, 867 N.E.2d at 383-84.  Second, Vekaria asserts that the defense does not apply because Chapman and ECI acted with "malice."  Vekaria Opp. to ECI & Chapman Br. at 23.  But the Second Amended Complaint does not allege any facts showing that Chapman and ECI acted out of malice toward Vekaria, and indeed the allegations that Chapman and ECI acted to avoid negative tax consequences and to prop up the value of their own shares renders Vekaria's bare assertion of malice implausible.  *See Kuhns*, 202 F. Supp. 3d at 442; *Ruha v. Guior*, 717 N.Y.S.2d 35, 36 (1st Dep't 2000) ("[B]are allegations of malice do not suffice, particularly where such allegations are contradicted by plaintiffs' own claims that defendants' actions were financially motivated."); *cf. also Steiner Sports Mktg., Inc. v. Weinreb*, 930 N.Y.S.2d 186, 187 (1st Dep't 2011) (explaining that the defendant's "normal economic interest in interfering" with a prospective employment relationship undermined the plaintiff's contention that the defendant's interference

was motivated by a desire to harm him).  And to the extent that Vekaria is also relying on the fraud exception to the economic-interest defense, that argument fails for the reasons discussed at *supra* III.B-C.[6]

For these reasons, the Court agrees that the economic-interest defense bars Vekaria's claim of tortious interference as against Chapman and ECI and that the Second Amended Complaint otherwise fails to plausibly allege tortious interference as against the other Moving Defendants. The Court accordingly grants the Moving Defendants' motions to dismiss as to Count Eight.

### E.    Count Nine – Conversion

Next, Vekaria asserts a conversion claim against all Defendants, alleging that they "acted in a manner inconsistent with Mr. Vekaria's equity ownership interests in MThree by preventing Mr. Vekaria from personally and individually reaping the benefit of his ownership."  SAC ¶ 111. To state a claim for conversion, a plaintiff must allege: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."  *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 204 (S.D.N.Y. 2011) (quoting *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)).  Even when these elements are satisfied, however, a plaintiff's claim for conversion cannot "merely restate[] its cause of action to recover damages for breach of contract" without "alleg[ing] a separate taking."  *Priolo Commc'ns, Inc. v. MCI Telecomms. Corp.*, 669 N.Y.S.2d 376, 377 (2nd Dep't 1998).   In other words, "[a] conversion claim may only succeed . . . if a plaintiff alleges wrongs and damages

---

[6] Vekaria's bare, unsupported assertion in his briefing that Defendants' efforts to avoid unfavorable tax consequences in connection with the Wiley acquisition was criminal, Vekaria Opp. to ECI & Chapman Br. at 23, is likewise entitled to no weight.

distinct from those predicated on a breach of contract." *Ellington Credit Fund*, 837 F. Supp. 2d at 204; *see also Briarpatch Ltd. v. Geisler Roberdeau, Inc.*, 148 F. Supp. 2d 321, 328 (S.D.N.Y. 2001) ("For a conversion claim to succeed in the context of a dispute regarding a contract, the breach of contract must result in some 'wrong' that is separately actionable."). To determine whether a conversion claim is truly distinct from a breach of contract claim, "courts look both to the material facts upon which each claim is based and to the alleged injuries for which damages are sought." *Lefkowitz v. Reissman*, No. 12 Civ. 8703 (RA), 2014 WL 925410, at *11 (S.D.N.Y. Mar. 7, 2014) (quoting *Physicians Mut. Ins. Co. v. Greystone Servicing Corp.*, No. 07 Civ. 10490 (NRB), 2009 WL 855648, at *10 (S.D.N.Y. Mar. 25, 2009)). Under this standard, conversion claims that are based on "the same facts underlying a contract claim" must be dismissed as duplicative. *Reade v. SL Green Operating P'ship*, 817 N.Y.S.2d 230, 231 (1st Dep't 2006).

In this case, Vekaria's conversion claim duplicates exactly his claim for breach of contract against Mthree. Both claims are based on the same operative facts, namely Defendants' alleged promise to provide Vekaria an equity stake in Mthree under the Employment Agreement and subsequent failure to do so, and allege the same harm. *Compare* SAC ¶ 112 (alleging conversion based on Defendants' deprivation of Vekaria's "equity interest" in Mthree), *with id.* ¶ 55 (alleging that Mthree breached the Employment Agreement by failing to provide Vekaria any equity in the company). Vekaria's conversion claim therefore fails. *See Physicians Mut. Ins. Co.*, 2009 WL 855648, at *10 (dismissing a conversion claim as duplicative of a breach of contract claim where the two claims were based on "the same facts" and sought "the same relief"). And despite Vekaria's suggestion otherwise, the same analysis applies to Wiley, ECI, and the Individual Defendants even though they were not formally parties to the Employment Agreement. *See Lefkowitz*, 2014 WL 925410, at *11.

Nor do the two cases Vekaria relies on undermine this outcome. In *Alishaev Brothers Inc. v. LA Girl Jewelry Inc.*, the court found the defendants liable for conversion because they fraudulently induced the plaintiff into parting with its merchandise, thereby committing a tort that would exist independent of any contract. No. 17 Civ. 7505 (JGK), 2020 WL 1489841, at *3 (S.D.N.Y. Mar. 27, 2020) ("The claim for conversion is not duplicative of the claim for breach of contract because the defendants engaged in fraudulent and wrongful conduct that goes beyond mere breach of contract by fraudulently inducing the plaintiff to enter into the contracts in the first place."). Similarly, in *Astroworks, Inc. v. Astroexhibit, Inc.*, the court concluded that the plaintiff stated a plausible claim for conversion where the defendant misappropriated the plaintiff's intellectual property, another wrong independent of any contractual obligations. 257 F. Supp. 2d 609, 618 (S.D.N.Y. 2003). And in fact, the *Astroworks* court rejected the conversion claim to the extent it was based on the defendant's promise that the plaintiff would receive an equity stake in the defendant's company, which the court found to merely duplicate the parties' contract without causing any independent non-contractual harm. *Id.* at 618 n.13. Here too, Defendants' failure to provide Vekaria an equity stake in Mthree is wrongful only insofar as it is a breach of the Employment Agreement, and therefore his conversion claim is duplicative. *See Elsevier Inc. v. Memon*, 97 F. Supp. 3d 21, 37 (E.D.N.Y. 2015) (dismissing a conversion claim where the defendants' conduct was wrongful only because they allegedly "breached their written promises" and the plaintiffs' "conversion claim therefore [did] not address[] a wrong separate and apart from their breach of contract claim").

Accordingly, the Court grants the Moving Defendants' motions to dismiss as to Count Nine.

**F.      Count Ten – Declaratory Judgment and Rescission**

Finally, in Count Ten, Vekaria seeks "a declaration that he has at all relevant times owned and continues to own the MThree Stock comprising 3% of the fully diluted stock ownership in MThree" as well as "the recission of any and all transactions, inclusive of the Putative Wiley Acquisition, that have attempted to transfer Mr. Vekaria's MThree Stock."  SAC ¶ 116.

The Court readily rejects Vekaria's request for a declaration as to his ownership rights to the shares of Mthree stock as duplicative of his breach of contract claim.  If he prevails on that breach of contract claim, Vekaria will have a legal remedy entitling him to the value of those shares.  Declaratory relief is thus not warranted.  *See Optanix, Inc. v. Alorica Inc.*, No. 20 Civ. 9660 (GHW), 2021 WL 2810060, at *4 (S.D.N.Y. July 6, 2021) (dismissing a claim for a declaratory judgment where it "would not clarify any uncertainty in the parties' legal relations that would otherwise remain unresolved as part of the breach of contract claim" and thus "would serve no purpose"); *Com. Lubricants, LLC v. Safety-Kleen Sys., Inc.*, No. 14 Civ. 7483 (MKB), 2017 WL 3432073, at *17 (E.D.N.Y. Aug. 8, 2017) ("[C]ourts routinely dismiss requests for declaratory judgment when the parties' rights will be adjudicated through a breach of contract claim in the same action.").

Vekaria's request for the remedy of recission fares no better.  Recission is "an 'extraordinary remedy' that is generally unavailable under New York law."  *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 5 (S.D.N.Y. 2020) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 143 (2d Cir. 2000)).  Indeed, as "an equitable remedy, rescission is available only if damages would not be a 'complete and adequate' remedy and 'the status quo may be substantially restored' by equitable relief."  *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017) (quoting *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d

867, 874 (N.Y. 1972)); *see also Romanoff v. Romanoff*, 51 N.Y.S.3d 36, 39 (1st Dep't 2017) ("The remedy of rescission is unavailable [where] money damages are available and will make [the] plaintiff whole.").

In his briefing, Vekaria half-heartedly suggests that he lacks an adequate remedy at law to the extent that he desires to "unwind all the subsequent deals that were unlawfully transacted without his authorization," a seeming reference, at least in part, to Wiley's acquisition of Mthree. Vekaria Opp. to Wiley & Mthree Br. at 24. But the Second Amended Complaint pleads no facts indicating that Vekaria's promised equity stake in Mthree would have given him any right or ability to prevent the company from being acquired, making Vekaria's entitlement to such sweeping relief speculative at best. Vekaria also provides no convincing explanation (or factual support) for why ordinary contract damages would not adequately compensate him for his promised equity or how, at this point, the Court could feasibly unwind Mthree's sale to Wiley and restore the previous status quo. *See Kachkovskiy v. Khlebopros*, 84 N.Y.S.3d 485, 488 (2d Dep't 2018) (rejecting a request for recission where monetary damages for the value of the plaintiff's shares "were available and would make the plaintiff whole").

The Court therefore grants the Moving Defendants' motions to dismiss as to Count Ten.

## IV. Conclusion

For these reasons, the Court grants the Moving Defendants' partial motions to dismiss the Second Amended Complaint. Counts Three, Four, Five, Six, Seven, Eight, Nine, and Ten of the Second Amended Complaint are dismissed as to the Moving Defendants. Because the grounds for dismissal set forth above appear to apply equally to Defendants Alex Headley and Benjamin Town, the Court also puts Vekaria on notice of its intent to *sua sponte* dismiss his claims against those

individuals as well.  Vekaria shall submit any arguments as to why these Counts should not also be dismissed as to Headley and Town within fourteen days of this Opinion and Order.

Otherwise, the only remaining claims are therefore Counts One and Two as against Mthree, which no party has moved to dismiss, and which were not at issue in this Opinion and Order. Mthree is ordered to answer Counts One and Two of the Second Amended Complaint on or before October 18, 2024.  The Clerk of Court is respectfully directed to terminate Wiley & Sons, Inc., ECI Partners LLP, Richard Chapman, and Thomas Seymour as Defendants in this action and to terminate the motions pending at Docket Numbers 92, 94, and 97.

SO ORDERED.

Dated: September 27, 2024
New York, New York

_____
JOHN P. CRONAN
United States District Judge